**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward Robert NIGRO, Jr.,
Defendant-Appellant.**

No. 81–5535.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1983.

Decided Feb. 13, 1984.

George V. Denny, III, argued, Sherman Oaks, Cal., for defendant-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Devon L. Gosnell, Asst. U.S. Atty., argued, Memphis, Tenn., for plaintiff-appellee.

Before LIVELY, Chief Judge, and EDWARDS, ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE and KRUPANSKY, Circuit Judges *.

LIVELY, Chief Judge, delivering the opinion for the Court.

A divided panel of this court reversed Nigro's conviction on four counts of drug-related offenses and one count of unlawfully carrying firearms during the commission of a felony. The government filed a petition for rehearing, with a suggestion that the case be reheard *en banc*. Rules 40 and 35, F.R.A.P. This court granted the petition for rehearing and directed that the case be reheard *en banc*. The effect of this action by the court was to vacate the previous opinion and judgment of this court and to restore the case on the docket as a pending appeal. Rule 14, Rules of the Sixth Circuit. The court received supplemental briefs from the parties and heard additional oral argument, after which the case was submitted for decision by the full court.

## I.

On April 26, 1977 a four-engine DC–6 cargo plane landed at Memphis International Airport at about 8:30 a.m. One of the engines on the plane was "feathered"—i.e., a propeller was not functioning and was turned inward toward the plane. It is common practice to notify the control tower of such a condition before landing. The district judge found, following a suppression hearing, that no notification was given. The plane also followed an unusual pattern in landing. Because the pilot had not notified the tower of the type of plane he was flying, it was necessary to change the landing instructions after the original approach. The plane landed and taxied to a private fuel supplier, Hi-Air, where it was refueled. The circumstances surrounding the arrival of the plane had aroused the concern of John Wright, Chief of the District Office of the Federal Aviation Agency (FAA), and sometime later he drove out to the Hi-Air ramp, parking his car under the nose wheel so the plane was immobilized.

Wright saw someone in the cockpit and climbed a ladder hanging from the side of the plane to the cockpit door. He identified himself as an FAA inspector and questioned the occupant about the plane. The occupant was Brian Corp, who said he was a pilot for Mackey Airlines and was delivering the plane from Miami to Detroit. When questioned further Corp was evasive and hostile, requesting Wright to leave the plane. Wright climbed down the ladder and directed another FAA official to check Corp's credentials. When this official attempted to question Corp further, Corp denied having his pilot certificate or his medical certificate, both of which are required to be carried by pilots and to be produced upon request by FAA officials. Upon further questioning Corp stated that he did not

---

* Circuit Judge Harry W. Wellford did not participate.

have a license and that he didn't even know his name. He gave similar answers to Wright a short time later.

While on the ladder Wright saw that the plane did not have a normal cabin door, but that a solid sheet of plywood was blocking the doorway. After descending the ladder Wright called airport security for assistance and notified the United States Customs Service in New Orleans of his suspicions concerning the plane. While going through the operations room at Hi-Air to make the call to New Orleans Wright saw two men walking back and forth between the DC-6 and the Hi-Air lounge. He stopped one of the men, and upon learning that he was with the DC-6, identified himself as an FAA inspector and said he wanted to talk with the man. The other person replied that he was going out to the plane and would talk with Wright later. Wright did not see either of the two men again.

One of the men who came off the plane requested the operations director of Hi-Air to refuel it. It required 4100 gallons of gas and 68 gallons of oil and took two to three hours to complete the fueling process. One of the men who left the plane when it landed had paid Hi-Air for the fuel with a $2,000 cashier's check and sixteen one-hundred dollar bills which he took from a briefcase filled with money.

After being called by Wright, Customs Inspector Halbert Jones went to the Hi-Air ramp and talked with Corp. Corp denied being the pilot and refused to answer when asked if he had entered from a foreign country and if he had a general declaration. When asked for identification Corp gave Jones his passport which showed entry and exit stamps for Colombia and Venezuela in February 1977. Corp again refused to answer when asked if he had been out of the country. Inspecting the exterior of the plane Jones saw nicks on the propellers and underside which indicated to him that the plane had been operated from a gravel airstrip. In addition, the windows were painted over and there was a large improvised latch on the exterior. Jones opened the unlocked belly cargo door of the plane and found marijuana debris in the compartment. Corp was arrested and placed in a police car. Subsequently a key which fit the lock on the plane was found in an ashtray in the police car near where Corp was seated. Jones then opened the compartment and found 5,420 pounds of marijuana, two .30 caliber M-1 carbine rifles and several hundred rounds of ammunition.

A bank teller identified Nigro as the person who had purchased a $2,000 cashier's check payable to Hi-Air, saying he paid for it with $100 bills which he took from a briefcase. Nigro's fingerprints were found inside the DC-6. A grand jury indicted Corp, Nigro and Jacques Damien Lee on July 12, 1977, charging them with conspiracy to possess controlled substances with intent to distribute and to import into the United States, 21 U.S.C. § 846; possession of controlled substances with intent to distribute, 21 U.S.C. § 841(a)(1); importation of marijuana, 21 U.S.C. § 952(a); possession of marijuana on an aircraft not having marijuana entered on the manifest, 21 U.S.C. § 955; and unlawfully carrying firearms during the commission of a felony, 18 U.S.C. § 924(c)(2).

Corp was brought to trial and in November 1977, a hearing was held on his motion to suppress evidence taken from the DC-6. The district court issued a memorandum opinion denying the motion. *United States v. Corp,* 452 F.Supp. 185 (W.D.Tenn.1977). Nigro was a fugitive until his arrest in March 1981. After his arrest he filed a pretrial motion to suppress the evidence and it was stipulated that the testimony would be substantially the same as that taken at the evidentiary hearing on Corp's motion and that a further hearing was not required. After Nigro's motion was denied he was convicted by a jury on all five counts of the indictment. The court sentenced Nigro to five years imprisonment on counts 2, 3 and 4, to be served concurrently, followed by two years special parole, and to three years imprisonment on count 5, to be served consecutive to the five-year sentence on counts 2, 3 and 4, for a total of eight years. Imposition of sentence on count 1

was suspended and Nigro was placed on probation for three years to begin at the termination of his sentences on counts 2, 3, 4 and 5. In addition the court imposed fines of $15,000 each on counts 1, 2, 3 and 4 for a total committed fine of $60,000.

## II.

■ On appeal Nigro argues that the officers did not have probable cause to search the airplane. Even if probable cause did exist, he argues that there were no exigent circumstances which excused the officers from the requirement of obtaining a search warrant. Though the government maintains that Nigro lacked standing to object to the search of the plane, we conclude that under all the circumstances, including the stipulation for use of the Corp hearing as a basis for deciding Nigro's motion, standing was established. The government contends there was abundant probable cause to search the DC–6 and that exigent circumstances recognized in the "automobile exception" to the requirement of a search warrant existed in this case.

■ Probable cause has been defined repeatedly by the Supreme Court in terms of the facts and circumstances known to the officers at the time the decision is made to undertake an arrest or search. *See, e.g. Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949):

> Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543.

(Footnote omitted). Tested by this standard we conclude that the officers did have probable cause to search the DC–6.

At the time the decision to search was made the officers knew that the plane had landed without giving the tower any notice of the feathered propeller or of its configuration, requiring an unusual landing pat-

tern. They knew that its fuel tanks were nearly empty and that the plane was capable of flying from South America without refueling. They knew that two of the three occupants had left the plane immediately after landing and had eventually paid for the fuel partly with $100 bills taken from a briefcase filled with money. They knew that these two men had disappeared after one of them agreed to talk with FAA Inspector Wright. They knew that the man who remained with the plane refused to answer questions about the origin of the flight to Memphis, the plane's flight or destination, and even claimed not to know his own name. When asked for identification this man, Corp, produced a passport which showed recent trips to Colombia and Venezuela.

In addition they knew that the plane had features not usually found on a DC–6. There was no cabin door and the passageway was completely covered with a piece of plywood. The windows had been painted over. The officers also knew that the underside and propellers had nicks which they associated with use of a gravel runway, an uncharacteristic practice for planes of this size in the United States. Taken together we have no doubt that the facts and circumstances known to the officers were sufficient to convince a prudent person that an offense had been or was being committed.

Nigro seeks to have the determination of probable cause rest on an individual and independent examination of each of the facts and circumstances. He argues that the officers had nothing more than a suspicion that the plane had violated customs laws and regulations and that none of the features of the plane referred to by the officers gave probable cause to believe that it contained contraband at that time.

Treating the known facts and circumstances in such a way as to require each one to point independently to the existence of probable cause has long been rejected by this court. In *United States v. Prince,* 548 F.2d 164, 166 (6th Cir.1977), this court quoted with approval a description of probable

cause formulated by then Circuit Judge Burger in *Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1969):

> "[P]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total."

The Supreme Court recently reaffirmed "the totality of circumstances analysis that traditionally has guided probable cause determinations." *See Illinois v. Gates,* ——— U.S. ———, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Though dealing specifically with the reliability of informant tips, the Court in *Gates* appears to have stated a general rule for evaluating facts and circumstances relied upon to establish probable cause. Considering the totality of circumstances known to the officers in the present case we conclude that they had probable cause to search the plane.

### III.

### A.

■ Though probable cause existed, the officers were required to obtain a search warrant before searching the plane unless excused by exigent circumstances. Nigro argues forcefully that there were no exigent circumstances. He points out that the DC–6 was on the ground more than two hours before the search was undertaken and that a federal magistrate was less than half an hour away. Of course, this overlooks the fact that the evidence on which the decision to search was made was not discovered all at once. Instead it was revealed in a number of events which occurred over the entire time between the plane's landing and the search. The totality of circumstances was not known until all the pieces were in place just before the decision to search was made. Only then was the "laminated total" available for weighing.

Nigro also contends that it was unreasonable to believe that Corp alone would, or could, take off after the other two occupants of the plane had departed. Again this overlooks the fact that the other two occupants were not in custody and the officers had no way of knowing when they might return and attempt to fly the plane away, nor whether other potential pilots were on board.

More to the point is Nigro's argument that the plane was immobilized and surrounded by officers who could have prevented any attempt to take off. The transcript reveals that Wright had removed his car from directly in front of the nose wheel before the search took place, but that other vehicles were parked in the vicinity of the plane and could have prevented its departure. Nigro argues that a plane will only move forward and there was no way the DC–6 could have taken off if officers wanted to prevent it and used the vehicles which were on the Hi-Air ramp. This argument requires us to decide whether the "automobile exception" applies to aircraft.

### B.

The automobile exception to the search warrant requirement was first enunciated in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). It has been repeatedly reaffirmed and applied by the Supreme Court. In *Arkansas v. Sanders,* 442 U.S. 753, 760–61, 99 S.Ct. 2586, 2591–92, 61 L.Ed.2d 235 (1979), the Court stated the rule and its rationale:

> One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime. See *United States v. Martinez-Fuerte, supra* [428 U.S. 543] at 561–562 [96 S.Ct. 3074 at 3084–3085, 49 L.Ed.2d 1116]; *United States v. Ortiz,* 422 U.S. 891, 896 [95 S.Ct. 2585, 2588, 45 L.Ed.2d 623] (1975); *Texas v. White,* 423 U.S. 67, 68 [96 S.Ct. 304, 305, 46 L.Ed.2d 209] (1975).

\*     \*     \*     \*     \*     \*

There are essentially two reasons for the distinction between automobiles and other private property. First, as the Court repeatedly has recognized, the inherent mobility of automobiles often makes it impracticable to obtain a warrant. See, *e.g., United States v. Chadwick, supra* [433 U.S. 1], at 12 [97 S.Ct. 2476 at 2484, 53 L.Ed.2d 538]; *Chambers v. Maroney,* 399 U.S. [42], at 49–50 [90 S.Ct. 1975 at 1980–1981, 26 L.Ed.2d 419]; *Carroll v. United States, supra.* In addition, the configuration, use, and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property. See *Rakas v. Illinois,* 439 U.S. 128, 155 [99 S.Ct. 421, 436, 58 L.Ed.2d 387] (1978) (POWELL, J., concurring); *United States v. Chadwick, supra; South Dakota v. Opperman,* 428 U.S. 364, 368 [96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000] (1978); *Cardwell v. Lewis,* 417 U.S. 583, 590 [94 S.Ct. 2464, 2469, 41 L.Ed.2d 325] (1974) (plurality opinion); *Cady v. Dombrowski,* 413 U.S. 433, 441–442 [93 S.Ct. 2523, 2528, 37 L.Ed.2d 706] (1973); *Almeida-Sanchez v. United States,* 413 U.S. 266, 279 [93 S.Ct. 2535, 2542, 37 L.Ed.2d 596] (1973) (POWELL, J., concurring).

(Citation omitted).

In *Carroll* the Court reviewed a number of statutes from 1789 forward which distinguished between the search of dwellings and of movable vehicles. It then stated:

We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable ·to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

267 U.S. at 153, 45 S.Ct. at 285. After concluding that probable cause existed for officers to search an automobile for illegal liquor after stopping it on a highway, the *Carroll* Court held that a warrant was not required.

In *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court determined that immobilization of an automobile by law enforcement officers does not remove the exigent circumstances which underlie the automobile exception. In *Chambers* an automobile was stopped, the occupants were arrested and the car was impounded and taken to a police station where it was thoroughly searched. No warrant was obtained, and the defendant sought to have weapons seized during the search excluded from evidence at trial. After quoting extensively from *Carroll* the Court held that the warrantless search at the police station was constitutionally permissible. Because of the inherent mobility of the automobile, "if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search." 399 U.S. at 51, 90 S.Ct. at 1981 (footnote omitted). The Court rejected the contention that a warrant was required and that the only permissible course of action was to hold the car until one could be obtained:

For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* at 52, 90 S.Ct. at 1981.

The holding in *Chambers v. Maroney* has been recently reaffirmed in *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 3081, 73 L.Ed.2d 750 (1982) (per curiam):

In *Chambers v. Maroney,* 399 U.S. 42 [90 S.Ct. 1975, 26 L.Ed.2d 419] (1970), we held that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody. We firmly reiterated this holding in *Texas v. White,* 423 U.S. 67 [96 S.Ct. 304, 46 L.Ed.2d 209] (1975). See also *United States v. Ross,* 456 U.S. 798, 807, n. 9 [102 S.Ct. 2157, 2163, n. 9, 72 L.Ed.2d 572] (1982). It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.[2] See *ibid.*

[2] Even were some demonstrable "exigency" a necessary predicate to such a search, we would find somewhat curious the Court of Appeals' conclusion that no "exigent circumstances" were present in this case. Unlike the searches involved in *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975)—which were conducted at the station house—the search at issue here was conducted on the roadside, before the car had been towed. As pointed out by Judge Deneweth, in dissent, "there was a clear possibility that the occupants of the vehicle could have had unknown confederates who would return to remove the secreted contraband." 106 Mich.App. 601 at 609, 308 N.W.2d 170 at 174.

We believe the holding of *Chambers v. Maroney* completely undercuts Nigro's arguments about the immobility of the airplane. The automobile exception has always depended on the inherent mobility of the vehicle to be searched, not on whether it could in fact be used immediately to effect a removal of evidence once investigating officers have determined that they have probable cause to search it and have taken steps to prevent its departure. As noted earlier, the Supreme Court referred to the "inherent mobility of automobiles" in *Ar-*

*kansas v. Sanders.* This court has also rested its decisions approving warrantless searches of automobiles on their inherent mobility. See *United States v. Combs,* 672 F.2d 574, 577 (6th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); *United States v. Brown,* 635 F.2d 1207, 1210 (6th Cir.1980). This DC–6 had the same inherent mobility.

### C.

Nigro asserts that there are fundamental differences between automobiles and aircraft which make it inappropriate to apply the automobile exception to planes. Though the Supreme Court has not decided this issue, several courts of appeals have held that the automobile exception applies to aircraft. In *United States v. Rollins,* 699 F.2d 530 (11th Cir.1983), the court upheld a warrantless search of an airplane, perceiving "no difference between the exigent circumstances of a car and an airplane." *Id.* at 534. Similar conclusions were reached in *United States v. Flickinger,* 573 F.2d 1349, 1357 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Coplen,* 541 F.2d 211, 215 (9th Cir.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1977); and *United States v. Brennan,* 538 F.2d 711, 721–22 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). The court in *Brennan* stated it was not holding that an airplane is the legal equivalent of an automobile, but it found that the mobility of a plane is sufficient to justify a warrantless search. It noted that an airplane has greater mobility than an automobile once it is airborne. It can fly at much higher speeds and can go in any direction, unlimited by any highway or system of highways.

In *United States v. Gooch,* 603 F.2d 122 (10th Cir.1979), the court discussed the similarities and differences between automobiles and airplanes insofar as they affect the applicability of the "automobile exception" to aircraft:

This Court has previously held the rule of *Chambers* applicable to airplanes as

well as to automobiles. *United States v. Sigal*, 500 F.2d 1118 (10th Cir.), *cert. denied*, 419 U.S. 954, 95 S.Ct. 216, 42 L.Ed.2d 172 (1974). Although a parked airplane whose occupants are removed is arguably less mobile than a similarly situated automobile—given the relatively few persons capable of piloting an airplane—an airplane is even more mobile in terms of its ability to cover great distances in a short time and its capacity to move without being restricted to discrete roadways. In terms of mobility, then, airplanes are logically encompassed within the *Chambers* doctrine.

Insofar as the *Chambers* rule turns on the reduced expectation of privacy one has in his automobile, most of what was said in *Chadwick* concerning automobiles applies to airplanes as well. Thus, an airplane's "function is transportation and it seldom serves as one's residence or as the repository of personal effects." 433 U.S. at 12, 97 S.Ct. at 2484. Although it does not travel "public thoroughfares where both its occupants and its contents are in plain view," *id.*, it ordinarily lands at airports open to the public where its occupants and contents are similarly visible. The pervasive regulation of automobiles and their drivers, *see id.* at 12–13, 97 S.Ct. 2476, is even exceeded by the regulation of airplanes and their pilots.

*Id.* at 124–25. The government has advanced and Nigro has answered the argument that there is a reduced expectation of privacy in an airplane. There is some doubt since the decision in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), whether reduced expectation of privacy is still a justification for the automobile exception. Reduced expectation of privacy aside, we are convinced that the inherent mobility of the DC–6 made the search permissible.

In conclusion, under *Chambers v. Maroney*, once probable cause existed the officers had the option of securing the DC–6 until a warrant could be obtained or searching it immediately. Nigro's Fourth Amendment rights were not violated by the search. Of course, if the officers had incor-

rectly assumed probable cause, exigent circumstances alone would not have justified the search. Here, however, we have found that both requirements for a warrantless search existed. Having reached this conclusion we do not address the alternative argument of the government that the search at the Memphis airport was the functional equivalent of a border search.

## IV.

Nigro's final argument is based on the language of 18 U.S.C. § 924(c)(2) which provides in pertinent part:

Whoever—

\* \* \* \* \* \*

(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

He does not dispute that the presence of the weapons on the plane satisfied the "carrying" requirement or that conviction for possession of marijuana with intent to distribute satisfied the requirement that the carrying take place during the commission of a felony. He does argue, however, that there was no showing that the weapons were carried "unlawfully."

Though section 924 bears the title, "Penalties," violation of 924(c)(2) is treated as a separate crime, not just a circumstance which requires an additional penalty for the "underlying felony." *United States v. Ramirez*, 482 F.2d 807, 813 (2d Cir.), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973). The *Ramirez* court examined the legislative history surrounding the phrase "carries a firearm unlawfully" and concluded that the unlawfulness must be shown apart from the mere possession of the firearm during the commission of a federal felony offense:

Thus, the legislative history plainly shows that carrying a firearm, without using it, during the commission of a fed-

eral felony, violates section 924(c)(2) only if possession of the firearm is itself unlawful.

*Id.* at 814. The unlawfulness of the possession may be determined by resort to any federal, state or local law. *United States v. Elorduy,* 612 F.2d 986, 990 (5th Cir.), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2997, 64 L.Ed.2d 861 (1980); *United States v. Howard,* 504 F.2d 1281 (8th Cir.1974).

■ Nigro made a timely motion for acquittal, arguing that the government had introduced no proof "as to who these weapons belong to." The entire argument of his counsel, the response of government counsel and the court's ruling indicate clearly that the ground of the motion was failure of the government to prove that Nigro had possession of the weapons. The question of whether Nigro's possession of the weapon was unlawful was not raised in arguing the motion or in an objection to the court's instructions. A close reading of the transcript leads to the conclusion that the parties and the court assumed that the possession of the weapons was unlawful because it took place during the commission of the underlying federal offense.

Nevertheless, this court has held that a motion for acquittal properly raises the issue of sufficiency of the evidence even if the defendant fails to specify the grounds therefor. *United States v. Cox,* 593 F.2d 46, 48 (6th Cir.1979). There was no evidence that Nigro's possession of the firearms was unlawful and it was error to permit the jury to consider the charge under § 924(c)(2) in the absence of such evidence. A conviction under such circumstances violates due process. *Thompson v. Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *cf. Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (changing "no evidence" rule of *Thompson* to accommodate the constitutional standard set forth in *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). If a local, state or federal statute making the possession of the weapons unlawful had been introduced and the jury had been instructed on its effect, Nigro's

argument would be unavailing. In the absence of such evidence and instruction the conviction on count 5 cannot stand. *See United States v. Garcia,* 555 F.2d 708 (9th Cir.1977).

The judgment of the district court is affirmed as to counts 1, 2, 3 and 4 and reversed as to count 5.

GEORGE CLIFTON EDWARDS, Jr., Circuit Judge, dissenting.

I concur in Judge Keith's dissent which follows but would like to add a few sentences.

In this case we should start with the basic Supreme Court holding that warrantless searches "are *per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). *See also Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

The search of the DC–6 involved in this case was certainly not "the functional equivalent" of a border search, *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). The search party did not know that this plane, before it was searched, had crossed the borders of the United States and landed initially at the Memphis Airport, nor had it been constantly observed from the border to its landing at Memphis so as to make it subject to a "border" search or to exempt it from observance of warrant procedures under the Fourth Amendment.

Nor do I think there were exigent circumstances known to the customs officers which served to exempt the search party from seeking a search warrant from a Magistrate. A four-engine transport plane parked at an airport is not comparable in mobility to an automobile on the highway. The facts known to the searching party did not in my opinion approach the exigent circumstances relied upon for the warrantless search in *Chambers v. Maroney,* 399

U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The customs officers in this case did not arrest or have any basis for arrest of the occupants of this plane prior to the warrantless search. *Cf. Chambers v. Maroney, supra* at 44, 90 S.Ct. at 1977, where the officers who made the search had detailed information on an armed holdup and description of the robbers and the escape vehicle.

The crucial fact in this case is that the circumstances claimed to constitute probable cause were not submitted to and determined by a neutral and detached Magistrate.

KEITH, Circuit Judge, with whom GEORGE CLIFTON EDWARDS, Jr. and NATHANIEL R. JONES, Circuit Judges, join, dissenting.

The decision by the majority today, upholding the warrantless search of an airplane, undermines the viability of the Fourth Amendment and has a "chilling effect" on the rights that it was enacted to protect.

A reading of the majority opinion requires us to recite the purpose of the Fourth Amendment. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const.Amend. IV.

As the Supreme Court has recognized: "These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford v. Texas,* 379 U.S. 476, 481–85, 85 S.Ct. 506, 509–11, 13 L.Ed.2d 431 (1964); *see also Marcus v. Search War-*rant 367 U.S. 717, 724–29, 81 S.Ct. 1708, 1712–14, 6 L.Ed.2d 1127 (1960).

The Fourth Amendment guarantees citizens and their possessions the right to be free from unreasonable searches and seizures. It is well-recognized that any "search conducted outside the judicial process, without prior approval by a judge or magistrate is per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1957). In the present case, the majority found, based on the totality of circumstances, that there was probable cause, i.e., a sufficient factual basis upon which a reasonably prudent person could believe that the airplane contained incriminating evidence. We disagree.

The officers were aware prior to the search of the plane that Brian Corp landed the DC–6 with a feathered engine. They also knew he did not have a pilot's license on his person. However, he was pleasant and voluntarily identified himself to a Federal Aviation Administration official who wanted to discuss the feathered engine problem. Corp also discussed the purpose and domestic origin of his flight with the official. Later, Corp became annoyed and told the official it was illegal for him to be on the ladder, and asked him to "please leave". Soon after the official reached the ground Corp delivered the aircraft's records to him.

Subsequently, Federal Aviation Administration officials detained and interrogated Corp. He refused to identify himself or discuss the domestic origin of his flight a second time. He also refused to indicate whether he had a general declaration. Later, however, he identified himself with a passport which indicated that he had exited a foreign country two months earlier.

The officers were also aware that the aircraft was first sighted two miles northeast of the airport. During its first few hours on the ground, three men associated with the aircraft made a cash downpayment

to obtain servicing from Hi-Air. Later, they cashed a check at a local bank and paid the balance of the bill in cash. Hi-Air personnel were not allowed aboard the aircraft while they serviced the feathered wing engine. The aircraft had a plywood cabin door and an exterior padlock on the cargo door. The windows of the DC-6 were covered. The underside of the aircraft and propellers had nicks which the officers associated with the use of a gravel runway. The aircraft also had the ability to fly from a foreign point non-stop to Memphis.

In reviewing these facts, we cannot reach a conclusion that there was probable cause to justify a search. First, the majority states that the plane had nicks in its underside and on its propellers, thus concluding that landings and takeoffs had occurred outside the United States. However, mere nicks on a plane cannot logically lead to an irrebuttable conclusion that there had been landings outside the United States. The whereabouts of the plane, and its takeoffs and landings prior to its arrival at Memphis are mere speculation. Second, Corp identified himself with a passport. The passport was being used for identification purposes only, not to gain admission to a country. The possession of a passport does not lead to an irrefutable conclusion that an international border had been crossed. Third, there was a padlock on the door of the plane, and the windows were covered. This was a private aircraft, which had the configuration of a cargo plane. It is not beyond reason that the windows of a cargo plane would be covered for protection. Nor, is it beyond reason that a plane's door would be padlocked to ensure the security of the plane's contents. None of these facts lead to an uncontrovertible conclusion that the cargo could be evidence of a crime. Based on these facts, we find that the majority erred in concluding that there was probable cause to search the plane.

Even if there was probable cause, as the majority asserts, failure to obtain a search warrant in light of the facts of this case was an egregious error of constitutional magnitude. The majority justifies the warrantless search by relying on the premise that the inherent mobility of an airplane creates an exigent circumstance. We find this argument to be unpersuasive.

The facts of this case clearly evince the absence of mobility. When James Wright, Chief of the Memphis Control Tower, arrived at the scene, he positioned his car in front of the plane. This prevented the plane from moving forward without incurring substantial damage. A plane cannot move in reverse. Throughout the episode, automobiles of local officials surrounded the plane. These facts provide uncontroverted evidence that the airplane was totally immobilized. Therefore, the mobility which provides the exigency for the automobile exception just did not exist in this case.

Moreover, the absence of exigent circumstances is further supported by several factors. First, Corp had been arrested, handcuffed, and placed in a patrol car prior to the search. Second, the other two persons associated with the plane were seen leaving the airport. Third, the engines of the airplane had been shut down and the doors were locked. Fourth, there were no sounds emanating from the plane which indicated that anyone else was on board. In light of these facts, and the totality of circumstances, it reaches the epitome of absurdity to state that this plane was mobile. To the contrary, the total immobilization of this plane makes it quite clear that the exigent circumstances of mobility did not exist in this case. Therefore, the warrantless search was unjustified.

Furthermore, the time period over which this episode transpired is of special significance. The airplane arrived at the Memphis Airport at approximately 8:30 a.m. This incident occurred over at least a two hour period. This was more than sufficient time to obtain a search warrant. A local magistrate was less than a half-hour away. A warrant could also easily have been obtained from a federal magistrate in a few moments by placing a telephone call. Fed. R.Crim.P. 41(c)(2). Yet, no attempt was ever made to obtain a search warrant. The United States Supreme Court stated in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) that:

The prominent place the warrant requirement is given in our decisions reflects the "basic constitutional doctrine that individual freedom will best be preserved through a separation of powers and divisions by functions among the different branches and levels of the Government." By requiring that conclusions concerning probable cause and the scope of a search be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime, we minimize the risk of unreasonable assertions of executive authority. 442 U.S. at 759, 99 S.Ct. at 2590 (citations omitted).

In light of the time period, the absence of exigent circumstances, and the immobilization of the plane, there was no basis for a warrantless search.

This warrantless search was an unreasonable assertion of executive authority. This is exactly the type of action that the Fourth Amendment was enacted to prevent. It is the duty of this Court to uphold the rights guaranteed by the Fourth Amendment. Instead, today, this Court has capitulated its responsibility and failed in this duty. Accordingly, we would reverse the decision of the district court.