*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0276P (6th Cir.)
File Name: 03a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

AARON JOSHUA,
    *Petitioner-Appellant,*

    *v.*        No. 01-4118

DON DEWITT,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00763—George C. Smith, District Judge.

Argued: January 28, 2003

Decided and Filed: August 7, 2003

Before: NELSON and CLAY, Circuit Judges; HAYNES,
District Judge.*

―――――――――

**COUNSEL**

**ARGUED:** Siobhan R. Clovis, PUBLIC DEFENDER'S
OFFICE, Columbus, Ohio, for Appellant. M. Scott Criss,

―――――――――

* The Honorable William J. Haynes, Jr., United States District Judge
for the Middle District of Tennessee, sitting by designation.

---

OFFICE OF THE ATTORNEY GENERAL,
CORRECTIONS LITIGATION SECTION, Columbus, Ohio,
for Appellee. **ON BRIEF:** Siobhan R. Clovis, David H.
Bodiker, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio,
for Appellant. M. Scott Criss, OFFICE OF THE
ATTORNEY GENERAL, CORRECTIONS LITIGATION
SECTION, Columbus, Ohio, for Appellee.

HAYNES, D. J., delivered the opinion of the court. CLAY,
J. (pp. 35-40), delivered a separate concurring opinion.
NELSON, J. (pp. 41-51), delivered a separate dissenting
opinion.

―――――――――

**OPINION**

―――――――――

HAYNES, District Judge. Petitioner Aaron Joshua appeals
the district court's order denying his petition for a writ of
habeas corpus to set aside his conviction of possession of
drugs by an Ohio court. Petitioner contends that he was
denied effective assistance of trial and appellate counsel in
that his trial and appellate counsel failed to challenge the
arresting officer's reliance upon a police flyer containing
information that Petitioner was a drug courier. Petitioner
asserts that despite a clearly applicable Supreme Court
precedent, *United States v. Hensley*, 469 U.S. 221 (1985), the
state failed to offer any proof that the police officer who
provided the information in the police flyer had reasonable
suspicion to believe that Petitioner was involved in criminal
activity. We **REVERSE** the district court's denial of the writ
and grant the writ subject to the state's retrial of Petitioner.

## BACKGROUND

*A. Procedural History*

On March 13, 1998, the Ross County, Ohio grand jury indicted Petitioner for one count of possession of crack cocaine in excess of 100 grams in violation of Ohio Revised Code (R.C.) § 2925.11. Count one included a separate specification under R.C. § 2941.1410 that charged Petitioner as a major drug offender. Petitioner's trial counsel filed a motion to suppress the fruits of the search conducted by state highway troopers, which yielded 100 grams of cocaine and the passenger's statement that implicated Petitioner's guilt. Petitioner's counsel asserted, in essence, that the length of the traffic stop alone violated Petitioner's Fourth Amendment rights under the United States Constitution. The state trial court denied the motion to suppress and Petitioner entered a plea of *nolo contendere*. The state trial court sentenced Petitioner to ten years in prison.

Petitioner filed a timely direct appeal with the Ohio Court of Appeals, asserting four claims of error, including that the state trial court erred in denying Petitioner's suppression motion because Petitioner's stop was unconstitutional by virtue of its duration, i.e., forty-two minutes. The Ohio Court of Appeals affirmed the state trial court's denial of Petitioner's motion to suppress and Petitioner's conviction.

Petitioner then filed an application with the Ohio Court of Appeals to reopen his direct appeal, arguing, in sum: (1) that the trial court erred because the state failed to establish the factual predicate for the dispatch that led to Petitioner's further detention and (2) that his counsel was ineffective for failing to pursue this deficiency in the state's case in the post-hearing briefs and on appeal. On January 11, 2000, the Ohio Court of Appeals denied Petitioner's application to reopen, but with a statement of its reasons. In a word, the Ohio Court of Appeals concluded that Petitioner's counsel "implicitly raised the issue of whether the dispatch justified the

detention," J.A. at 104, but did not discuss *Hensley*. The Ohio Court of Appeals also ruled that independent grounds existed to justify Petitioner's detention that resulted in the discovery of the drugs. Petitioner then filed a timely appeal to the Ohio Supreme Court, contending that the Ohio Court of Appeals misconstrued or ignored Petitioner's claim that Petitioner's appellate counsel was ineffective. On May 3, 2000, the Ohio Supreme Court dismissed the appeal for want of a substantial constitutional question.

On July 5, 2000, Petitioner filed his petition for writ of habeas corpus in district court, asserting that both his trial and appellate counsel were ineffective for failing to challenge the factual basis of the police flyer that the arresting officer relied upon to conduct the investigative detention of Petitioner after his traffic stop. The district court denied the petition for habeas relief, but issued a certificate of appealability. In sum, the district court held that the Ohio Court of Appeals' application of clearly established federal law was not objectively unreasonable in finding that Petitioner was not denied effective assistance of trial counsel, because there were "alternate grounds justifying [P]etitioner's detention." (J.A. at 172). The district court further held that the Ohio Court of Appeals' finding that Petitioner was not denied effective assistance of appellate counsel was not objectively unreasonable, because "the issue of [P]etitioner's detention was squarely presented for both the trial and appellate courts to review." (J.A. at 173). The district court did not discuss *Hensley*.

*B. Facts*

The state suppression hearing transcript reflects that on March 2, 1998, at 11:07 a.m.[1], Petitioner was traveling southbound on State Route 104 in a rental car when Trooper

---

[1] Due to a videotape of Petitioner's detention and arrest, the precise timing of events was preserved.

James Hannon, with the Ohio Highway Patrol, executed a traffic stop for speeding. According to Trooper Hannon, his radar revealed that Petitioner was traveling sixty-seven miles per hour in a fifty-five mile per hour speed zone. Petitioner was traveling from Columbus to Portsmouth, Ohio, and was accompanied by Gabriella Chapman and her infant child. As Trooper Hannon approached the vehicle, he noticed that Petitioner and Chapman were acting nervous and suspicious. Trooper Hannon asked Petitioner for "his license, registration and proof of insurance." (J.A. at 150). Petitioner gave Trooper Hannon his driver's license and rental car papers. Prior to returning to his patrol car to conduct a status check of Petitioner's driver's license, Trooper Hannon questioned Petitioner about his travel plans. Trooper Hannon's suspicion increased when Petitioner described his route between Columbus and Portsmouth, because, according to Trooper Hannon, the route described by Petitioner "didn't make any sense what so ever." (J.A. at 151).

At 11:10 a.m., Trooper Hannon returned to his patrol car to run a status check on Petitioner's driver's license and to determine if there were any outstanding warrants against Petitioner. A dispatcher informed Trooper Hannon that Petitioner did not have any outstanding warrants. Another Trooper, Terrell Barnes, overheard the exchange between dispatcher and Trooper Hannon, and directed the dispatcher's attention to an entry in the station's "Read and Sign" book. (J.A. at 145).

This "Read & Sign" book contains police intelligence information. As to Petitioner, the "Read and Sign" book reflected an entry from a Columbus Police Department report that Petitioner was a known drug courier who transported illegal narcotics between Columbus and Portsmouth. The dispatcher then relayed this information to Trooper Hannon and, as a result, Trooper Hannon advised the dispatcher to send a canine unit to the scene. The dispatcher attempted immediately to contact a canine unit in the area. In the interim, Trooper Hannon decided that Petitioner was not free

to leave based upon the information from the "Read & Sign" book. When asked at the suppression hearing whether he could verify the information in the "Read & Sign" book, Trooper Barnes answered, "No. No." (J.A. at 148).

At 11:15 a.m., the dispatcher called the Columbus Police Department to determine if Petitioner had any outstanding warrants, and was informed that Petitioner did not. At 11:17 a.m., Trooper Barnes arrived at the scene and, at this time, Trooper Hannon observed Petitioner and Chapman being nervous and restless. After he was informed that Petitioner was a known drug courier, Trooper Hannon examined the rental car papers and discovered that the rental car papers did not match the vehicle that Petitioner occupied. At 11:20 a.m., Trooper Hannon asked the dispatcher to contact Enterprise rental car company to determine if Petitioner were in lawful possession of the rental vehicle. By 11:22 a.m., Trooper Hannon learned that Enterprise reported Petitioner to be in lawful possession of the vehicle, but Trooper Hannon decided to detain Petitioner until the canine unit arrived at the scene. At 11:25 a.m., the dispatcher reached the first available canine unit in the area.

At 11:45 a.m., Sergeant Turner arrived at the scene and assisted Trooper Hannon in placing stop sticks under Petitioner's vehicle to prevent Petitioner from driving away. At 11:49 a.m., forty-two minutes after the initial stop, Trooper Terry Mikesh, the canine unit handler, arrived at the scene. Trooper Mikesh testified that it took her twenty-four minutes to arrive at the scene due to traffic. While at the scene, the patrol canine alerted on the right seam of the vehicle's passenger door. Thereafter, the officers conducted a pat-down of Chapman, the passenger, for weapons and illegal narcotics and discovered a large quantity of crack cocaine concealed under her clothing. After the search, Chapman stated that she was carrying the drugs for Petitioner, and as a result, the officers placed Petitioner under arrest for possessing more than 100 grams of crack cocaine in violation of R.C. § 2925.11.

# DISCUSSION

## A. Standard of Review

We review a district court's denial of a writ for habeas relief *de novo* because the district court's decision was based solely upon the record. *See Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2001). A state court's findings of fact are presumed to be correct and may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Whether Petitioner was denied his right to effective assistance of counsel "is a mixed question of law and fact that we review *de novo*." *Hunt v. Mitchell*, 261 F.3d 575, 580 (2001) (citing *Olden v. United States*, 224 F.3d 561, 565 (6th Cir. 2000)). The controlling principle is "to apply a rule of law that was clearly established at the time Petitioner's state court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). The relevant date here is May 3, 2000, when the Ohio Supreme Court denied Petitioner's motion to reopen the Ohio Court of Appeals' decision.

Petitioner filed his habeas petition after April 4, 1996, and therefore, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams*, the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." 529 U.S. at 412-13. In such instances, the Supreme Court held that a federal habeas court may grant a writ. *Id*.

Moreover, the Supreme Court stated that under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 410-11. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)).

Under *Williams*, we must initially review the state court decision as we find it. Under 28 U.S.C. § 2254(e)(1), we must accord a presumption to any "determination of a factual issue made by a state court." Our standard of review does not permit us to speculate here as to what the state trial court may have done if an objection expressly citing and arguing *Hensley* had, in fact, been made nor can we speculate as to what the additional proof, if any, would have been, if the state prosecutor had attempted to comply with *Hensley*.

### B. *Petitioner's Ineffective Assistance of Counsel Claims*

Under the Sixth Amendment of the United States Constitution, "[i]t has long been recognized that the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The right to effective assistance of counsel exists "to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). In *Strickland*, the Supreme Court formulated a two-pronged test when examining an ineffective assistance of counsel claim. *Id*. at 691. Under the first prong, a petitioner must "show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687. In a word, counsel's performance must have been so deficient that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id*.

In determining whether counsel's performance fell below an objective standard of reasonableness, a reviewing court "must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *Strickland*, 466 U.S. at 689-90. To be sure, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Thus, a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Strickland*, 466 U.S. at 689.

Counsel's deficient performance alone, however, is insufficient to grant relief on a claim for ineffective assistance of counsel. *Strickland's* second prong requires that counsel's deficiency actually caused prejudice to Petitioner. For *Strickland's* second prong, Petitioner must demonstrate that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

In *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), the Supreme Court held as an exception to *Stone v. Powell*, 428 U.S. 465 (1976), that a claim of ineffective assistance of counsel can permissibly include a claim that trial counsel failed to litigate competently an issue under the Fourth Amendment. To obtain habeas relief, the Supreme Court stated that "[t]he [petitioner] must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice" under *Strickland's* second prong. 477 U.S. at 375. The Supreme Court further explained that the Fourth and Sixth Amendment claims have "separate identities and reflect different constitutional values," and therefore must be analyzed separately. *Id*.

### 1. *Deficient Performance of Trial Counsel Under Strickland*

As to *Strickland's* first prong, Petitioner contends that his trial counsel's performance fell below the standard of reasonableness because trial counsel failed to challenge Petitioner's contention that the state did not prove the factual basis for the "Read & Sign" information relied upon by Trooper Hannon to detain Petitioner, nor did trial counsel cite this deficiency in his post-hearing briefs or on direct appeal. The crux of Petitioner's argument is that the prosecutor failed to establish a factual predicate for Trooper Hannon's reliance on information in the "Read & Sign" book that was necessary to support Petitioner's continued detention. In support of his claim, Petitioner relies upon *Hensley*, 469 U.S. at 232.

In *Hensley*, on December 4, 1981, two armed men robbed a tavern in St. Bernard, Ohio, a Cincinnati suburb. *Id*. at 223. A few days later, a St. Bernard police officer spoke with an informant who told the officer that Thomas Hensley had driven the getaway vehicle during the robbery. *Id*. The informant prepared a written statement to this effect and, as a result, the St. Bernard officer "immediately issued a 'wanted flyer' to other police departments in the Cincinnati metropolitan area." *Id*. The flyer listed the date and location of the robbery and cautioned that Hensley was armed and dangerous. *Id*. The flyer also stated "that Hensley was wanted for investigation of an aggravated robbery." *Id*. Finally, the flyer gave a description of Hensley, and requested "other [police] departments to pick up and hold Hensley for the St. Bernard police" department. *Id*.

On December 10, 1991, the Covington Police Department headquarters, in another suburb of Cincinnati, received the "wanted flyer" and "read [the flyer] aloud at each change of shift." *Id*. A few of the Covington police officers were familiar with Hensley and looked periodically for him where "he was known to frequent." *Id*. On December 15, 1991, a Covington police officer observed Hensley driving a vehicle that was stopped in the middle of the street. *Id*. at 223-24. This officer instructed Hensley to move on, and as Hensley drove off, the officer contacted the dispatcher to determine if there were any outstanding warrants for Hensley. *Id*. at 224. Before the dispatcher answered, two other Covington police officers relayed "that there might be an Ohio robbery warrant outstanding on Hensley." *Id*.

While the dispatcher verified whether Hensley had any outstanding warrants, two of the Covington police officers drove around in areas where Hensley stayed in an attempt to locate him. *Id*. At some point, one of the Covington police officers observed a white vehicle in one of these areas and approached the vehicle "with his service revolver drawn and pointed into the air." *Id*. This officer instructed Hensley and the passenger to step out of the vehicle, and shortly thereafter

a second officer arrived at the scene. *Id*. The second officer approached the passenger door and "observed the butt of a revolver protruding from underneath the passenger's seat." *Id*. The passenger was arrested, and the officers searched the vehicle and discovered two other handguns. *Id*. at 225. The officers then arrested Hensley. *Id*.

Hensley was eventually indicted for possession of a firearm as a convicted felon. *Id*. Hensley moved to suppress the handguns obtained pursuant to the search, arguing that his initial stop violated the Fourth Amendment. *Id*. The district court denied Hensley's motion to suppress, and after conducting a bench trial, the district court convicted Hensley. *Id*. This Court reversed the conviction, holding that because the Covington police were unaware of the ongoing crime that led to the issuance of the flyer, they lacked reasonable suspicion to stop Hensley and perform an investigative detention as permitted under *Terry v. Ohio*, 392 U.S. 1 (1968). *Hensley*, 469 U.S. at 224. The Supreme Court reversed.

The Supreme Court held that for a past crime, reliance upon a flyer or bulletin could justify "a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information," but only if the officer who issued the flyer or bulletin had "articulable facts supporting a reasonable suspicion that the person wanted ha[d] committed an offense . . . ." *Id*. at 232 (citations omitted). The Supreme Court explained that when an officer objectively relied upon a flyer or bulletin to conduct a *Terry* stop, "*the evidence uncovered in the course of the stop is admissible if the police who issued the flyer* or bulletin possessed a reasonable suspicion justifying the stop . . . ." *Id*. at 233 (emphasis added in the original and added in part). Similarly, for an actual arrest, the Supreme Court also held that "when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest." *Id*. at 231

(emphasis in the original). In either instance, the Supreme Court explained that "[i]t does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance." *Id*. at 231. The Supreme Court further explained that the stop must not be "more intrusive than would have been permitted the issuing department." *Id*. at 231 (emphasis added).

As applied here, Trooper Hannon relied upon information from the "Read & Sign" book as the basis for his *Terry* stop of Petitioner. Thus, under *Hensley*, the issue of whether the evidence discovered during Petitioner's stop is admissible turns on whether the officer who provided the information in the "Read & Sign" book had articulable facts supporting a reasonable suspicion that Petitioner was involved in criminal activity. *Id*. at 231.

Considering *Hensley* and the facts here, we conclude that a reasonable trial attorney would have raised the *Hensley* issue at trial. First, the Supreme Court decided *Hensley* in 1985, and at the time of Petitioner's suppression hearing, *Hensley* was, and remains, clearly established law. Second, the specific facts here clearly give rise to a *Hensley* challenge. In *Hensley*, the Supreme Court considered whether a "wanted flyer" issued by a law enforcement agency that an individual was involved in a robbery can be relied upon by other law enforcement agencies to justify an investigative detention of that individual. The facts in *Hensley* are almost identical to the facts here in that the information from the "Read & Sign" book issued by the Columbus Police Department that Petitioner was a known drug courier, was relied upon by Trooper Hannon to request a canine unit and to conduct an investigative detention of Petitioner.

Here, at the suppression hearing, the state failed to offer any evidence from the officer who provided the information from the "Read & Sign" book that was relied upon by Trooper Hannon, the arresting trooper. Thus, the prosecution failed to comply with *Hensley* by failing to present proof that the

officer who provided the information in the "Read & Sign" book had articulable facts to support a reasonable suspicion that Petitioner was involved in criminal activity. Without testimony from the officer who provided the information for the "Read & Sign" book, the record does not support the reasonableness of Trooper Hannon's reliance on that report to detain Petitioner or to use the evidence obtained from Petitioner's detention. Further, the State of Ohio has never contended that there exists a justifiable basis for the "Read & Sign." The State has certainly not argued what the nature of the basis would be nor has it made any offers of proof regarding the basis. Thus, the facts here are clearly distinguishable from *Hensley* because the evidence is lacking to show that the officer, who provided the information for the "Read & Sign" book, had reasonable suspicion that Petitioner was a drug courier.

Although we agree with Respondent that Petitioner cannot second guess trial counsel's strategy, there is nothing in the record to reflect that Petitioner's trial counsel considered and declined to raise *Hensley* for strategic reasons.[2] Further, we cannot discern any strategic reason why Petitioner's trial counsel would decline to raise this issue.

---

[2] Even the dissent concedes that if Petitioner's trial counsel had been familiar with *Hensley*, "he probably would (*and should*)" have raised this contention "in connection with the motion to suppress." (Nelson, J., dissenting)(emphasis added). If Petitioner's counsel should have raised the issue presented in *Hensley*, this would certainly demonstrate that counsel's performance was, in fact, deficient under *Strickland*. Moreover, in light of the fact that the state court record does not reflect that Petitioner's counsel even considered the issue presented in *Hensley*, Petitioner's counsel's failure to do so cannot be seen as "a legitimate defense tactic or strategy." *See Lyons v. Jackson*, 299 F.3d 588, 598, n.15 (6th Cir. 2002)(citing *Bell v. Cone*, 535 U.S. 685 (2002)) (observing in the context of a guilty plea, that a defense counsel's failure "to consider, let alone notify the client of, a factor that could negate the entire benefit of the guilty plea is not within the range of professional norms" and "can never be a legitimate defense tactic or strategy.").

Respondent next argues that *Hensley* is limited to "***initial stops***," but we disagree. Although the police flyer in *Hensley* was used to justify an initial stop, the Supreme Court in *Hensley* clearly held that its requirement expressly applies to both *Terry* stops and to searches incident to lawful arrests. 469 U.S. at 231 (stating, after its holding, that "[i]t remains to apply the two sets of principles described above to the stop and subsequent arrest of respondent Hensley."). We conclude that *Hensley* requires any police flyer relied upon for a *Terry* stop and to "***further detain***" an individual, must be supported by articulable facts from the issuing officer to show reasonable suspicion that the individual has been involved in criminal activity. Accordingly, Respondent's argument that *Hensley* is limited to initial stops lacks merit.

Respondent next argues that the state court reasonably applied clearly established federal law in finding that Petitioner received effective assistance of trial counsel because Petitioner's counsel vigorously argued his motion to suppress at the hearing. Further, Respondent cites the Ohio Court of Appeals' conclusion that factors independent of the information in the "Read & Sign" book justified Trooper Hannon's reasonable suspicion.

In our view, the Ohio Court of Appeals did not consider *Hensley* in either of its opinions. Second, the Ohio courts' conclusion that other evidence existed to support a finding of reasonable suspicion for Petitioner's detention independent of the information from the "Read & Sign" book, is a separate issue from Petitioner's claim that a reasonable trial attorney would have raised the *Hensley* issue under the facts here. The Ohio courts' finding of independent facts to support Petitioner's detention relates to *Strickland's* prejudice component, not to whether Petitioner's trial counsel's performance was deficient.

Given *Hensley's* clear precedential authority as well as the unique factual similarities that exist between the investigative detention in *Hensley* and Petitioner's detention, we conclude

that a reasonable defense attorney would have raised the *Hensley* issue. Therefore, we conclude that Petitioner's trial counsel's performance fell below the objective standard of reasonableness under *Strickland*.

### 2. Deficient Performance of Appellate Counsel Under Strickland

As to Petitioner's claim of ineffective assistance of appellate counsel, Petitioner asserts that his appellate counsel also failed to raise *Hensley*. A defendant is entitled to effective assistance of counsel in connection with a defendant's first appeal of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Yet, appellate counsel need not raise every nonfrivolous argument on direct appeal. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). To be sure, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52). Appellate counsel, however, is required to exercise reasonable professional judgment. *Jones*, 463 U.S. at 753. Nevertheless, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002)(quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

The Ohio Rule of Criminal Procedure 52(B) provides that "[p]lain error or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the [lower] court." Ohio R. Crim. P. 52(B). Thus, Petitioner's appellate counsel could have raised the *Hensley* claim on appeal, despite trial counsel's failure to present the *Hensley* claim to the Ohio trial court. Given the wording of Ohio Rule 52(B) as well as our conclusion that *Hensley* is clearly applicable, we conclude that a reasonable appellate counsel would have raised *Hensley* in Petitioner's first appeal. Therefore, we conclude that Petitioner's

appellate counsel's performance fell below the objective standard of reasonableness under *Strickland*.

We must next consider whether Petitioner's counsel's performance prejudiced Petitioner under *Strickland's* second prong.

### 3. Prejudice

As to *Strickland's* prejudice component, Petitioner must show that there "is a [reasonable] probability sufficient to undermine confidence in the outcome and the fundamental fairness" of the trial. *Strickland*, 466 U.S. at 694. In assessing this issue, we are also mindful that habeas relief may not be granted "simply because [we] conclude[] in [our] independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be [objectively] unreasonable." *Williams*, 529 U.S. at 365.

Under *Hensley*, without the testimony of the officer who provided the information from the "Read & Sign" book that was relied upon to detain Petitioner further, the trial court could not admit the proof from the stop that resulted in Petitioner's arrest. Clearly, the drug courier information from the "Read & Sign" book was the only fact justifying Trooper Hannon's decision to request the canine unit that resulted in Petitioner's extended detention. Further, the State of Ohio has never contended that there exists a justifiable basis for the "Read & Sign." The State has certainly not argued what the nature of the basis would be nor has it made any offers of proof regarding the basis. Without the objective evidence to find reasonable suspicion giving rise to Petitioner's continued detention, we conclude that *Hensley* bars the admissibility of the evidence seized at the scene of Petitioner's arrest, including the drugs and his companion's statement. *Hensley* clearly held that to admit the evidence from the stop, the police officer who actually issued the flyer must testify as to the specific facts underlying the report. *Hensley*, 469 U.S. at

233 ("Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop . . . .").

In sum, the prejudice shown is that on this record, if the defense counsel had made a *Hensley* challenge, there would not be any facts to support Trooper Hannon's detention of Petitioner. Thus, the evidence uncovered from the stop would have been inadmissible. Without the evidence from the stop, there is a substantial probability that Petitioner would not have been convicted. This prejudice satisfies *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) and *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000).

### a. "Contrary To" Analysis

We next address Respondent's argument that the Ohio Court of Appeals' finding of an independent basis under *Terry* is sufficient to justify the trooper's investigative detention of Petitioner. In sum, the Ohio Court of Appeals found that apart from the information from this "Read & Sign" book, other factors justified the trooper's reasonable suspicion to detain Petitioner, namely: (1) the discrepancy in the rental car papers; (2) the "furtive movements" made by Petitioner and his companion during the traffic stop; (3) the illogical route given by Petitioner regarding his travel plans; and (4) Petitioner's and his companion's nervousness.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Whren v. United States*, 517 U.S. 806, 810 (1996). The Supreme Court noted that a traffic stop is lawful, provided there is probable cause to find that a traffic violation has occurred. *Id*. at 810. Yet, once the traffic stop is completed, the occupants of the vehicle must be allowed to leave "unless something that occurred during the traffic stop

generated the necessary reasonable suspicion to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995).

In *United States v. Sokolow*, 490 U.S. 11, 12 (1989), the Supreme Court stated that "[t]he reasonable-suspicion standard is . . . *applicable only to those brief detentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exigencies such as the need to stop ongoing crimes, to prevent imminent crimes, and to protect law enforcement officers in highly charged situations.*" (Emphasis added). Reasonable suspicion is based on the totality of the circumstances and must require "articulable reasons" and "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

In determining reasonable suspicion, "[f]irst, a court must identify all of the relevant historical facts known to the officer at the time of the stop and search; and second, it must decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search." *Ornelas v. United States*, 517 U.S. 690, 700-01 (1996). In *Delaware v. Prouse*, 440 U.S. 648, 661 (1978), the Supreme Court warned that "[t]o insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . .'" *Id.* (citing *Terry*, 392 U.S. at 22).

We set forth these Fourth Amendment standards because *Kimmelman* clearly requires for this type of ineffective assistance of counsel claim, that we consider the underlying Fourth Amendment claims. *Kimmelman*, 477 U.S. at 375.

As to the first fact cited by the Ohio Court of Appeals, Trooper Hannon conceded that within two minutes, his inquiry revealed that Petitioner was in lawful possession of the rental car. Yet, before Trooper Hannon made the inquiry about the discrepancy in the rental car papers, he had already decided to detain Petitioner and requested a canine inspection of the rental vehicle. In a word, from the state court record, the discrepancy in the rental car papers was not relied upon by Trooper Hannon to justify Petitioner's continued detention. Thus, we conclude that the discrepancy of the rental car papers was not an independent factor that could have supported Trooper Hannon's continued detention of Petitioner.

As to the second fact, i.e., furtive movements, the Ohio Court of Appeals found that "[Petitioner] and his passenger made furtive gestures and appeared increasingly nervous as the detention continued." (J.A. at 104-05). To justify a *Terry* stop, the officer must "be able to point to specific and articulable facts" that support reasonable suspicion. *Terry*, 392 U.S. at 21. The Ohio Court of Appeals' use of the phrase "furtive gestures" is a characterization, not an independent fact. From our review, there is no objective evidence in this record that would support the trooper's opinion upon which the Ohio Court of Appeals relied for its characterizations that Petitioner and his companion exhibited furtive gestures. The state trial record does not contain testimony that Petitioner or his companion moved their bodies or arms to conceal anything or to reach for any item.[3] Further, we are unable to

---

[3] We note that when Trooper Mikesh, the canine unit handler, arrived at the scene and initially approached the vehicle, she observed Petitioner "trying to hide something or [as] if [Petitioner was] going to come out with a weapon, I don't know." (J.A. at 160). Trooper Mikesh, however, did not arrive at the scene until 11:49 a.m., forty-two minutes after the initial stop. Thus, we conclude that in light of Trooper Mikesh's late arrival upon the scene, her observations of Petitioner (that could be reasonably characterized as furtive moments), were not the basis for Trooper Hannon's continued detention of Petitioner and his companion.

discern specific and articulable facts to support the trooper's opinion that Petitioner made furtive gestures.[4] If Petitioner and/or his companion had engaged in any "furtive gestures", the troopers would have been justified in ordering Petitioner and his companion out of the vehicle and performing a cursory pat-down of Petitioner and his companion as permitted under *Terry*. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111-12 (1977). Yet, here, there is nothing in the record to reflect that Trooper Hannon performed a cursory pat-down of Petitioner or his companion after observing their behavior during the traffic stop. In fact, the troopers did not conduct a pat-down of the passenger until the canine patrol alerted on the seam of the passenger door of the rental car. To accept the trooper's conclusory remark of nervousness and restlessness to establish the reasonable suspicion standard is contrary to *Terry* and *Prouse* because to do so results in reliance upon the trooper's hunches.

Thus, upon our review of the record, the Ohio Court of Appeals' finding of furtive gestures is not supported by objective facts, and cannot be an independent factor to justify

---

Therefore, Trooper Mikesh's observation cannot be considered as those furtive movements that the Ohio Court of Appeals relied upon as one of the factors, apart from the "Read & Sign" book, to support its finding that Trooper Hannon had reasonable suspicion to further detain Petitioner.

[4]In this regard, Trooper Hannon's testimony at the suppression hearing was that "[o]nce Trooper Barnes arrived [at the scene], I witnessed nervousness and restlessness in the vehicle that I have never witnessed . . . from occupants of a vehicle since I had been on the highway patrol." (J.A. at 159). Yet, nervousness and restlessness is a far cry from furtive movements. Further, when Trooper Hannon testified that Petitioner and Chapman appeared nervous and restless, he did not articulate what Petitioner and Chapman were doing for Trooper Hannon to support his testimony. Thus, even if we were to consider this testimony as the basis for the state trial and appellate court's use of the phrase "furtive gestures", we conclude that this testimony is not supported by specific and articulable facts which would support his opinion that Petitioner and Chapman appeared to be nervous and restless.

Trooper Hannon's continued detention of Petitioner. The only remaining factors articulated by the Ohio Court of Appeals to support its finding that Trooper Hannon had reasonable suspicion, are Petitioner's and his companion's nervousness and the illogical route Petitioner gave regarding his travel plans.

As to nervousness, the Supreme Court noted that "[o]ur cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)[5] (emphasis added). For this proposition, the Supreme Court cited several of its decisions involving evasive efforts to escape detection at the Mexico border and airports. *United States v. Brignoni-Ponce*, 422 U.S. 875, 885 (1975) ("The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) ("[T]he three confederates . . . had spoken furtively to one another. One was twice overheard urging the others to 'get out of here.' Respondent's strange movements in his attempt to evade the officers aroused further justifiable suspicion . . . ."); *Sokolow*, 490 U.S. at 5, 8-9 (noting that "[Respondent] appeared to be very nervous and was looking all around the waiting area," but that "one taking an evasive path through an airport might be seeking to avoid a confrontation with an angry acquaintance or with a creditor").

The purpose of these quotations from the Supreme Court decisions is that "nervous, evasive behavior" is the standard to justify reasonable suspicion, not nervousness or restlessness. Here, the trooper's perception of Petitioner and his companion were not objective facts of "nervous, evasive behavior." As to Petitioner's travel route, while the route made no sense to the trooper, the route is not a fact suggestive

---

[5]*Wardlow* was decided on January 12, 2000, and is to be considered here because the final date of Petitioner's conviction is May 5, 2000.

of illegal conduct. Whether considered individually or collectively, Petitioner's cited conduct could be perfectly consistent with innocent behavior, and we conclude that nervousness and illogical travel plans could not give rise to an "inference supporting a reasonable suspicion of criminal activity" to justify Petitioner's continued detention. *Florida v. Royer*, 460 U.S. 491, 512 (1983) (Brennan, J., concurring). Thus, Trooper Hannon's continued detention of Petitioner was unreasonable under the Fourth Amendment and, as a result, the Ohio courts unreasonably denied Petitioner's motion to suppress.

We conclude that the state court decision was "contrary to" clearly established Supreme Court precedent because *Hensley* clearly requires that where a police flyer is used to justify a police officer's reasonable suspicion for a stop of the person, the state must present proof that the police officer who issued the flyer had reasonable suspicion to do so for evidence from the stop to be admissible. On this record, the state's proof on the *Hensley* issue was clearly deficient. A reasonable counsel would have so argued on Petitioner's behalf. Neither Petitioner's trial nor his appellate counsel cited *Hensley* to argue that the state did not meet its evidentiary burden, as required under *Hensley*. On this record, if the *Hensley* argument were made, the evidence from Petitioner's stop would be inadmissible. "Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, *we hold that evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop*." *Hensley*, 469 U.S. at 233 (emphasis added). Without the fruits of the Troopers' detention and search, there is a substantial uncertainty as to whether Petitioner's conviction can stand.

In addition, we believe that the state court decision was contrary to clearly established Supreme Court precedent because the state failed to meet its evidentiary burden by presenting proof that the officer who issued the "Read & Sign" had reasonable suspicion to do so, as required under

*Hensley*. To hold otherwise would render *Hensley* meaningless.

The dissenting opinion lists several facts that were not found by the Ohio Court of Appeals and relies upon its independent review of the record to support its conclusion that Petitioner's detention was reasonable under the Fourth Amendment. With the exception of the facts of an illogical route and the "Read & Sign," the dissent's additional facts include: (1) Trooper Hannon's knowledge of a "highly interesting telephone conversation between his dispatcher and a police officer in Portsmouth;" (2) Petitioner's and his companion's suspicious behavior once backup arrived; (3) Trooper Hannon's awareness of Petitioner's criminal history; (4) notice by the Portsmouth detective that Petitioner might be armed and dangerous; and (5) the patrol dog alerting on the vehicle.

As to the telephone conversation between the dispatcher and a Portsmouth police officer as well as notice by the Portsmouth police department that Petitioner might be armed and dangerous, the dissenting opinion notes that around 11:15 a.m., when Trooper Hannon was informed about the Read & Sign, the dispatcher promised Trooper Hannon that he would have a detective familiar with Petitioner call Trooper Hannon back. Yet, the record reflects that the detective did not call Trooper Hannon back until 11:48 a.m., one minute prior to the arrival of the drug-sniffing dogs. Even assuming that the detective provided Trooper Hannon with enough first-hand information to reach the level of reasonable suspicion (which is not apparent from the record), we conclude that Trooper Hannon was not entitled to detain Petitioner indefinitely while waiting on a telephone call from a detective who was "familiar" with Petitioner, in order to acquire sufficient reasonable suspicion. That is to say, the promise of potential future reasonable suspicion does not satisfy the demand for present (and continuing) reasonable suspicion.

As to Petitioner and his companion's nervousness once backup arrived, the dissent notes that Petitioner and his companion displayed "constant activity in the vehicle" that Trooper Barnes described as looking backward to watch the police activity and staring at the officers. Yet, in our view, this behavior, as was articulated by Trooper Barnes, seems to be as consistent with innocence as with guilty. In a word, anyone who has been pulled over and detained for a certain length of time, only to see backup police arrive (with no explanation from the officers as to why) would, at the least, be curious as to the necessity for backup. We further note that none of the officers described excessive shaking, stammering, or attempts to conceal anything on the part of either vehicle occupant. Again, behavior that is consistent with innocent activity cannot suffice to establish reasonable suspicion. *Royer,* 460 U.S. at 512.

As to Trooper Hannon's awareness of Petitioner's past criminal history, the dissent contends that this awareness, coupled with the other factors, gave rise to reasonable suspicion to detain Petitioner. We conclude, however, that this fact, by itself, does not create a reasonable suspicion that criminal activity is *currently* afoot, which is what the Supreme Court requires. *Terry*, 392 U.S. at 30. We further note that although past criminal activity is a factor that can be taken into consideration, in this case it does not create reasonable suspicion when considered in tandem with Petitioner's alleged nervousness, unarticulated furtive gestures, and "illogical" travel route. More importantly, the record reflects that Trooper Hannon did not learn of Petitioner's past criminal history until 11:22 a.m. or 11:23 a.m., by which time Trooper Hannon had already verified that Petitioner was in lawful possession of the rental car and had already been detaining Petitioner without reasonable suspicion for quite some time.

Finally, the dissent also relies upon the patrol dog's alert on the vehicle to conclude that reasonable suspicion existed to detain Petitioner. We concede that the patrol dog's alert not

only gave rise to reasonable suspicion, but also gave rise to probable cause for the police to then search Petitioner's vehicle. Yet, the patrol dog did not alert on the vehicle until 11:49 a.m., and leading up to this point, reasonable suspicion did not exist when one considers the totality of the circumstances. Thus, in our view, the patrol dog's alert on the vehicle does not satisfy the Fourth Amendment inquiry, if we are able to conclude that reasonable suspicion to detain Petitioner did not exist until the dog alerted on the vehicle.

Albeit in a probable cause context, a longstanding Supreme Court precedent is articulated in *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964), wherein the Supreme Court stated that:

Whether [an] arrest [is] constitutionally valid depends in turn upon whether, at the moment the arrest [is] made, the officers ha[ve] probable cause to make it- -whether at that moment the facts and circumstances within their knowledge and of which they ha[ve] reasonably trustworthy information [a]re sufficient to warrant a prudent man in believing that the [suspect] ha[s] committed or [is] committing an offense.

*Id*. (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). *See also United States v. Nigro*, 727 F.2d 100, 103 (6th Cir. 1984)("Probable cause has been defined repeatedly by the Supreme Court in terms of the facts and circumstances known to the officers at the time the decision is made to undertake an arrest or search.")(citing *Brinegar*, 338 U.S. at 175-76).

We find that these principles also apply in a reasonable suspicion context such that a reviewing court must look to the "facts and circumstances known to the officers at the time the decision is made to undertake a detention" of the suspect. *Nigro*, 727 F.2d 103. Accordingly, while we have considered those factors enumerated by the dissent, in determining whether Trooper Hannon had reasonable suspicion to detain Petitioner, we primarily look to those "facts and

circumstances known to [Trooper Hannon] at the time" he made the decision to detain Petitioner. *Id.* Yet, in our independent review of the state court record and under the totality of the circumstances of this case, those factors enumerated by the dissent, considered individually or collectively, still do not give rise to reasonable suspicion to justify Petitioner's detention.

Nevertheless, in considering the factors relied upon by the dissent, we are still mindful that our focus is on whether the state court's "decision was 'contrary to' or an 'unreasonable application of' [Supreme Court] clearly established precedents, or whether it was 'based upon an unreasonable determination of the facts.'" *Price v. Vincent*, 538 U.S. ___, 123 S.Ct. 1848, 1852 (2003). In this regard, we note that under *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000), where a state court fails to articulate its reasoning, "federal habeas courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 943 (citing *Aycox v. Lytle*, 196 F.3d 1174, 177-78 (10th Cir. 1999). Yet, any independent review that is conducted must remain deferential to the state court's decision and cannot amount to a "full, *de novo* review of the claims." *Harris*, 940 F.3d at 943. While *Harris* does not expressly preclude federal courts from conducting an independent review of the record when the state court articulates its reasoning, in evaluating habeas claims, federal courts must be careful not to engage in a *de novo* review. *Price*, 123 S.Ct. at 1852. Instead, under *Prince*, federal courts are limited to evaluating habeas claims "through the lens of § 2254(d)." *Id. See also Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (finding a distinction between independent review of the record and a *de novo* review such that an independent review "does not . . . independently ascertain whether, in its judgment, there has been a violation of the petitioner's

constitutional rights prior to determining whether the state court's decision was reasonable.").

Here, the Ohio Court of Appeals clearly articulated its factual findings and reasoning in denying Petitioner's challenge to his conviction. While we are not precluded from engaging in an independent review of the state court record, we are prohibited from substituting our own independent judgment as to what we believe the state courts could and/or should have considered in reaching its conclusions. Nevertheless, our independent review of the state court record for clear error reveals that Trooper Hannon lacked a justifiable factual basis, in effect, to detain and/or arrest Petitioner.

### b. *"Unreasonable Application" Analysis*

Under the "unreasonable application" clause of the AEDPA, we must compare the facts found by the Ohio Court of Appeals for its conclusion, to the applicable Supreme Court precedents. To be sure, the Ohio Court of Appeals' express factual findings that supported Petitioner's continued detention are namely (1) the discrepancy in Petitioner's rental car papers; (2) Petitioner's illogical route; and (3) Petitioner and his passenger made furtive gestures and appeared increasingly nervous.

First, we consider the Ohio Court of Appeals' failures to consider *Hensley* to be an unreasonable application of clearly established Supreme Court precedents. *Hensley* is at the core of Petitioner's Sixth Amendment claim, and *Kimmelman* requires its consideration. Second, we conclude that Petitioner's detention could not be justified by the facts found by that court under relevant Supreme Court precedents. As to the "Read & Sign", under *Hensley*, this information cannot be used to support whether Trooper Hannon had reasonable suspicion to detain Petitioner because the state failed to present proof that the officer who caused the entry of the "Read & Sign" had reasonable suspicion to do so. As to the

fact of Petitioner's illogical route, we conclude this fact, even when coupled with Petitioner's appearance of nervousness, to be insufficient to give rise to reasonable suspicion to justify Petitioner's continued detention. In light of these conclusions, the state court unreasonably applied clearly established Supreme Court precedent, which requires specific facts justifying reasonable suspicion of criminal conduct, *Terry*, 392 U.S. at 21.

Our standard of review does not permit us to engage in a full scale *de novo* review, but an independent review of the state court record reflects that the critical facts to justify Petitioner's detention here are those facts Trooper Hannon identified in his decision to detain Petitioner.

Q:   In fact, Mr. Joshua was not free to leave from the time that you heard the information about the READ AND SIGN. Correct?

A:   Correct.

* * *

Q:   When was it after . . . when did you check the rental car information after you made the decision that Mr. Joshua was not free to leave?

A:   Once I found out about the READ AND SIGN information, that was the first time I looked at the rental papers.

Q:   So, actually you had made the decision that Mr. Joshua was not free to leave before you looked at the rental information?

A:   Correct.

(J.A. at 128, 129-30).

Under Supreme Court and our precedents, this testimony is the classic formulation for an arrest that requires probable cause. *See Dunaway v. New York*, 442 U.S. 200, 215-16 (1979); *United States v. Obasa*, 15 F.3d 603, 607 (6 th Cir. 1994) ("When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause.").

At that point, the only facts that Trooper Hannon possessed, apart from the "Read & Sign" information, was that Petitioner and his passenger appeared nervous and suspicious, and that Petitioner gave an illogical route. Thus, even if we were to undertake an independent review, this is the critical point of Petitioner's detention, because this decision lead to the subsequent course of events resulting in the discovery of the evidence used against Petitioner to secure his conviction. At this point, however, Trooper Hannon lacked reasonable suspicion to detain Petitioner or probable cause to arrest Petitioner. Trooper Hannon actually did the latter.

From his testimony, Trooper Hannon lacked probable cause to arrest Petitioner. *Dunaway, 442 U.S. at 215-16.* Petitioner was prejudiced by his counsel's failure to raise the contention under *Hensley*, because without the information contained in the "Read & Sign," Trooper Hannon lacked specific and objective facts to justify reasonable suspicion to detain Petitioner. The exclusion of the "Read & Sign" proof establishes a "reasonable probability that the result would have been different." *See Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000).

In sum, we conclude that because Petitioner had a meritorious Fourth Amendment claim, Petitioner has shown

prejudice due to his trial counsel's deficient performance.[6] Petitioner's appellate counsel was also ineffective for failing to raise *Hensley*, given our conclusion that Petitioner would have been meritorious on his Fourth Amendment claim and that under Ohio law, Petitioner's appellate counsel could have raised the *Hensley* issue on appeal.

On the prejudice issue, we recognize that in *Arizona v. Evans*, 514 U.S. 1, 3-4 (1995), the Supreme Court discussed

---

[6] We note that the dissenting opinion contends that a *Hensley* challenge would not have altered the state trial court's decision to deny Petitioner's motion to suppress because the state trial court concluded that Petitioner lacked standing to challenge the drug seized from and/or the statements by his companion. Yet, *Hensley* expressly provides that "[a]ssuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, *we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer possessed a reasonable suspicion justifying the stop . . . .*" *Hensley* 469 U.S. at 233. Hence, a *Hensley* challenge in this case would have compelled the granting of Petitioner motion to suppress because the state failed to prove that the officer who issued the flyer relied upon to detain Petitioner had reasonable suspicion to do so. Two Circuit Courts have interpreted Supreme Court precedents to support the proposition that all occupants of a vehicle have a right to challenge the illegality of the stop and/or detention. *See United States v. Woodrum*, 202 F.3d 1, 5-6 (1st Cir. 2002) (citing *Rakas v. Illinois*, 439 U.S. 128, 138-39 (1978))(holding that "each occupant of a car has a right to challenge the propriety of a traffic stop under the Fourth Amendment."). *See also United States v. Erwin*, 875 F.2d 268, 269, n.2 (10th Cir. 1989) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963))("Even if defendant lacks standing to challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poisonous tree' doctrine.").

Here, given our conclusion that Petitioner's detention was illegal, then, under *Hensley*, the evidence uncovered from the passenger and the search of her person is inadmissible. Because we conclude the detention to be unreasonable under the Fourth Amendment, Petitioner has standing to challenge any evidence obtained from that detention as fruit of the poisonous tree. *Wong Sun*, 371 U.S. at 484. Thus, we respectfully disagree with the dissenting opinion's contention that the state trial court's decision would not have been changed if Petitioner's trial counsel raised a *Hensley* challenge.

---

*Hensley* and held that the facts there did not require the evidence seized in violation of *Hensley* to be excluded. In *Evans*, the Supreme Court held that the exclusionary rule did not require the suppression of evidence that was seized in violation of the Fourth Amendment where an officer relied upon a police record that was later determined to be erroneous due to omissions of court employees or sheriff office employees. 514 U.S. at 3-4, 5, 15. The Supreme Court in *Evans* stated that "[t]he question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Id*. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). In a word, a successful *Hensley* challenge does not automatically compel the exclusion of evidence seized in violation of the Fourth Amendment; rather, "exclusion is appropriate only if the remedial objectives of the [exclusionary] rule are thought most efficaciously served." 514 U.S. at 14 (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

The exclusionary rule is a judicial remedy that operates "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures," as well as to maintain the integrity of the judicial process. *Calandra*, 414 U.S. at 348. The rule's application is limited to those "instances where its remedial objectives are thought most efficaciously served." *Evans*, 514 U.S. at 11 (citing *United States v. Leon*, 468 U.S. 897, 908 (1984)). Yet, if "the exclusionary rule does not result in appreciable deterrence, then clearly, its use . . . is unwarranted." *United States v. Janis*, 428 U.S. 433, 454 (1976).

We conclude that the remedial objectives of the exclusionary rule are "most efficaciously served" here because the evidence was seized due to an unlawful detention, and therefore should have been suppressed. While the historical purpose of the exclusionary rule is to deter police

misconduct, in light of the prosecutor's interest in the outcome of this case, we conclude that the exclusionary rule also serves to deter prosecutorial misconduct in its failure to comply with clearly established constitutional principles. Here, *Hensley* clearly required evidence from the police officers who provided the information in the "Read & Sign" book that those officers had reasonable suspicion to believe that Petitioner was involved in criminal activity. Consistent with *Hensley*, "a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying the stop." *Hensley*, 469 U.S. at 233 (emphasis added in the original and added in part). The prosecutor's failure here was in circumstances in which the Ohio Court of Appeals believed the *Hensley* issue was implicitly raised. Failure to apply the exclusionary rule under these circumstances would render the Supreme Court's clear holding in *Hensley* meaningless. The exclusionary rule's application here would deter prosecutors from failing to present the necessary proof required by *Hensley*.

As to whether the exclusionary rule was properly applied here, we note that the exclusionary rule and the Fourth Amendment are designed to constrain state governments. This includes state prosecutors. The application of the exclusionary rule is appropriate given that *Hensley*, clearly applicable law, was violated. Moreover, *Hensley* focuses expressly on the requisite proof that the state must introduce in these circumstances. Here, the critical omission was the state prosecutor's failure to establish at the suppression hearing whether the officer who issued the "Read & Sign" had reasonable suspicion to do so, as required under *Hensley*, clearly established Supreme Court precedent. If one of the purposes of the Fourth Amendment is to constrain state governments, the enforcement of the exclusionary rule here is well served by deterring prosecutors from failing to comply with clearly established constitutional principles, such as

*Hensley*.[7] The effect of our ruling on the state's non-compliance with clearly established Supreme Court precedent is Petitioner's retrial or release.

### CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's denial of Petitioner's petition for habeas relief because the state court judgment was objectively unreasonable and Petitioner was denied effective assistance of trial and appellate counsel. This action is **REMANDED** for further proceedings consistent with this opinion.

---

[7]We note that the dissenting opinion contends that we are second guessing the judgment call of the state prosecutor, we respectfully disagree. Our ruling simply requires state prosecutors to comply with a constitutional rule of evidence that is necessary to establish the justification to detain or arrest a citizen. If the presentation of such proof were not required, the effect would be that the mere issuance of a flyer would constitute sufficient proof that an officer had a reasonable suspicion of criminal activity, contrary to *Hensley*.

---

### CONCURRENCE

---

CLAY, Circuit Judge, concurring. Although I agree with the outcome reached in this case, as well as most of the majority opinion's reasoning, I write separately to articulate my view of some of the issues in this case, and why I am persuaded that the Ohio Court of Appeals' decision to affirm Joshua's conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Fourth Amendment requires a law enforcement officer to possess reasonable suspicion to detain a suspect at a traffic stop; thus, if reasonable suspicion is not apparent at the outset of a traffic stop, the officer must release the suspect. *Berkemer v. McCarty,* 468 U.S. 420, 439-40 (1984) ("[U]nless the detainee's answers provide the officer with probable cause to arrest him, he must be released."). If the officer is suspicious at the outset but the officer's inquiries reasonably allay that suspicion, the officer must release the suspect. *Hayes v. Florida,* 470 U.S. 811, 815-16 (1985); *United States v. Heath,* 259 F.3d 522, 531 (6th Cir. 2001); *United States v. Butler,* 223 F.3d 368, 375 (6th Cir. 2000). The officer may not detain a suspect without legal justification in hopes of generating reasonable suspicion by observing the suspect's subsequent actions or by acquiring subsequent information.

The record in the instant case indicates that Trooper Hannon detained Joshua's vehicle based on the Read & Sign. However, for the reasons stated in the majority opinion, the Read & Sign did not provide the requisite reasonable suspicion. Thus, Trooper Hannon should have released Joshua at that time or shortly thereafter. Instead, Trooper Hannon continued to detain Joshua while he waited for the

drug-sniffing dogs to arrive. It was unreasonable under the circumstances to detain Joshua for even a short time pending the arrival of the drug-sniffing dogs because at that point Trooper Hannon lacked a sufficient basis for detaining him. In point of fact, the dogs did not arrive until 11:49 a.m., some forty-two minutes after the traffic stop had been initiated. A detention of that duration without a sufficient legal basis was particularly unreasonable.

The intervening developments at the scene of the traffic stop cited by the Ohio Court of Appeals and described by the dissent did not provide the requisite reasonable suspicion in lieu of the Read & Sign. A fair reading of the record shows that the events proceeded as follows:

11:07 a.m.   Trooper Hannon stops Joshua's car. Joshua gives Hannon his driver's license and car rental papers.

11:10 a.m.   Trooper Hannon runs a status check; the dispatcher informs him about the Read & Sign entry. Trooper Hannon requests a canine unit.

11:15 a.m.   The dispatcher calls Columbus to see if Joshua has any outstanding warrants; there are none. Around this same time, the dispatcher promises Trooper Hannon that he will have a detective "familiar" with Joshua call Trooper Hannon back.

11:17 a.m.   Trooper Barnes arrives on the scene. Joshua and his companion exhibit "constant activity in the vehicle."

11:20 a.m.   Trooper Hannon asks the dispatcher to check on Joshua's car rental papers.

11:22 a.m.   Joshua's rental papers check out. The dispatcher runs a criminal check on Joshua and transmits the results of Joshua's criminal history to Trooper Hannon.

11:25 a.m. The dispatcher reaches a canine unit.

11:45 a.m. Sergeant Turner arrives and helps Trooper Hannon place stop sticks around Joshua's vehicle.

11:48 a.m. A detective who is "familiar" with Joshua calls Trooper Hannon back; he tells Trooper Hannon that Joshua may be armed and dangerous.

11:49 a.m. A canine unit arrives. The drug-sniffing dog alerts on Joshua's vehicle, whereupon the police search the vehicle and discover drugs.

None of these events permitted Trooper Hannon to detain Joshua over this forty-two minute time frame. Certainly the concern about the rental car paperwork did not provide reasonable suspicion because the discrepancy in the paperwork perceived by the trooper did not surface until approximately 11:18 a.m. Trooper Hannon should already have released Joshua by 11:18 a.m. because by that time Trooper Hannon had already detained Joshua for several minutes without reasonable suspicion. Moreover, the paperwork discrepancy was resolved expeditiously, i.e., around 11:22 a.m., leaving a twenty-seven minute time gap until the drug-sniffing dogs arrived.

Furthermore, none of the additional factors cited by the dissent amounted to reasonable suspicion. As the majority opinion points out, by the time reasonable suspicion had surfaced, Trooper Hannon had been detaining Joshua illegally for a substantial period of time, and thus a Fourth Amendment violation had already occurred notwithstanding any subsequent events purportedly giving rise to reasonable suspicion. The additional factors mentioned by the dissent, even when considered in tandem with the other facts, fail to constitute reasonable suspicion.

For instance, the dissent notes that although Joshua and his companion were initially calm, upon the arrival of backup

they began turning around and staring at the officers. Yet, as the majority opinion correctly observes, the behavior described by Trooper Barnes might evidence little more than mere curiosity or concern by the two individuals as to their surroundings and the ever-increasing police activity. Any interpretation of this behavior as an indication that criminal activity was afoot amounts to little more than an "inchoate and unparticularized suspicion or 'hunch.'" *Reid v. Georgia,* 448 U.S. 438, 441 (1980) (*per curiam*) (rejecting as a possible basis for reasonable suspicion the airport agent's testimony that the defendant and his traveling companion "appeared . . . to be trying to conceal the fact that they were traveling together" because the defendant "preceded [the companion] and occasionally looked backward at him as they proceeded through the [airport] concourse," and reasoning that this behavior provided "too slender a reed to support the seizure in this case") (quoting *Terry v. Ohio,* 392 U.S. 1, 27 (1968)) (internal quotation marks omitted); *see also Florida v. Royer,* 460 U.S. 491, 512 (1983) (Brennan, J., concurring) (observing that facts leading the airport agents to detain the defendant did not constitute reasonable suspicion because they were "perfectly consistent with innocent behavior and [could not] possibly give rise to any inference supporting a reasonable suspicion of criminal activity"). Simply stated, turning around and staring at the police officers did not create a "rational inference[]" that "reasonably warrant[ed] the continued detention of" Joshua and his companion. *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry,* 392 U.S. at 21).

Similarly unpersuasive as grounds for reasonable suspicion is Trooper Hannon's purported knowledge of a "highly interesting telephone conversation between his dispatcher and a police officer in Portsmouth" and the statement by the Portsmouth detective that Joshua might be armed and dangerous. The information that Joshua might have been armed and dangerous, apparently of dubious origin and reliability, was not transmitted to Trooper Hannon until 11:48 a.m., some forty-one minutes after the traffic stop

commenced. As the majority opinion correctly notes, a police officer may not properly detain a suspect in the hope of receiving useful information in the future.

I also am not persuaded that Trooper Hannon's awareness of Joshua's criminal record, even when considered together with Joshua's purported nervousness, unarticulated furtive gestures, and "illogical" travel route, justified this lengthy detention. First of all, the record does not specify the nature of Joshua's criminal history, obviating any consideration of the criminal history's probative value on habeas review. Second, Trooper Hannon was not informed of Joshua's criminal history until 11:22 a.m. or 11:23 a.m. The situation presented by this case therefore differs markedly from the situation where a law enforcement officer has a legitimate basis to suspect a particular individual of a criminal offense and is advised during the course of the detention that the person being investigated has a criminal record suggestive of the kind of criminal activity under investigation. In that situation, which is obviously not present here, a further detention of the suspect in all likelihood would be justified.

Finally, the fact that the patrol dogs ultimately alerted on Joshua's vehicle does not assist our legal analysis because although such an occurrence ordinarily would furnish probable cause for a police officer to search a vehicle for drugs, *United States v. Bailey,* 302 F.3d 652, 659 n.7 (6th Cir. 2002), the subsequent discovery of circumstances justifying probable cause–coming long after Joshua should have been released–cannot vitiate Joshua's earlier improper detention without reasonable suspicion.

The dissent is correct that in some cases reasonable suspicion can properly be gleaned from several facts, considered in concert, none of which individually would give rise to reasonable suspicion. However, as previously stated, the factors cited in the dissent, even when taken together, do not meet this burden. Four of these additional factors did not manifest themselves until well after the point that Trooper

Hannon should have released Joshua. The other factor–Trooper Hannon's having learned from the dispatcher that a man with Joshua's name was allegedly transporting drugs from Portsmouth to Columbus–is simply the information from the Read & Sign, on which Trooper Hannon cannot be permitted to rely, based upon the holding of *United States v. Hensley*, 469 U.S. 221, 233 (1985).[1]

To summarize, I am principally persuaded that Joshua's habeas petition should be granted because the Read & Sign did not provide the requisite reasonable suspicion to justify the detention which eventually led to the discovery of the illegal drugs, and the additional justification for the detention, as described by the Ohio Court of Appeals and the dissent herein, was wholly inadequate and failed to establish reasonable suspicion. For these reasons, I concur in the majority opinion.

---

[1]The majority opinion reasons, as alternative grounds for disregarding the additional factors cited by the dissent, that this Court is not permitted to look beyond the facts found in the state court's opinion, citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) for this proposition. Whether the reasoning in *Harris* extends to the present situation is uncertain at best. *Harris* seems to speak to the situation where the state court has not articulated its reasoning, in which case federal courts are obligated to review the entire record. *Harris* does not seem to expressly state that federal courts are *precluded* from conducting an independent review of the record when the state court has articulated its reasoning. Although the majority opinion's reading of *Harris* might be appropriate, I do not find it necessary to rest my reasoning on those grounds. Instead, I am content to base my reasoning on the fact that the factors cited by the dissent and the Ohio Court of Appeals were insufficient to justify Joshua's detention.

---

**DISSENT**

---

DAVID A. NELSON, Circuit Judge dissenting. The stars that must be in alignment before the issuance of a writ of habeas corpus can be justified in this case include all of the following:

1) Petitioner Joshua's Fourth Amendment right to be secure against unreasonable searches and seizures must be found to have been so jeopardized by what happened here that the state courts were required, as a matter of federal law, to exclude the evidence of Joshua's criminal activity.

2) Joshua must be found to have been denied his Sixth Amendment right to counsel, a finding dependent upon his satisfying both branches of the test in *Strickland v. Washington*, 466 U.S. 668 (1984):

   a) he must show that his lawyers were guilty of "incompetence" (see *Kimmelman v. Morrison*, 447 U.S. 365, 382 (1986)) when they failed to support their suppression arguments with a citation to *United States v. Hensley*, 469 U.S. 21 (1985), and

   b) he must show a reasonable probability that the state courts would have reached a different result if their attention had been called to *Hensley*.

3) The state court decisions on both the admissibility of the evidence and the alleged denial of right to counsel must have been "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d).

I am not persuaded that any of these prerequisites can fairly be held to have been met. But perhaps the clearest ground for affirming the district court's denial of habeas relief is that Joshua flunks the "prejudice" branch of the *Strickland* test. As I read the state court record, the conclusion that Joshua suffered no prejudice as a result of his lawyers' failure to cite *Hensley* is the only conclusion that could reasonably be reached.

To start with the proceedings before the state common pleas court, I note that defense counsel made a timely objection to the admission in evidence of the "Read & Sign" bulletin on which Trooper Hannon relied in detaining Joshua. The lawyer argued that the bulletin constituted "hearsay on hearsay" and that it "was never verified." Although a citation to *Hensley* would obviously have been appropriate at that point,[1] it is crystal clear that such a citation would not have changed the common pleas court's decision to deny Joshua's motion to suppress. This is so because the denial of the motion was based on the court's conclusion that Mr. Joshua lacked standing to challenge the search of his drug-laden companion – a conclusion that could not logically have been affected by anything in *Hensley*. If the result would have been the same in any event, there could have been no prejudice.

As to the proceedings in the Ohio court of appeals, I believe it is equally clear that Mr. Joshua was not prejudiced by his appellate lawyer's failure to cite *Hensley*. Echoing the argument made by trial counsel in objecting to the introduction of the "Read & Sign" bulletin, appellate counsel told the court of appeals that Mr. Joshua had been detained for 42 minutes because Trooper Hannon "had received hear-

---

[1] "If Aaron Joshua's court-appointed trial counsel had been familiar with the Supreme Court's opinion in *Hensley*," as I acknowledged in an earlier draft of this dissent, "he probably would (and should) have cited it . . . ."

say from the dispatcher that the dispatcher had hear-say from another trooper who had read a hear-say document drafted seven (7) days earlier by [Trooper Mikesh] stating that she had heard from unknown sources within the Columbus police that Aaron Joshua may be transporting cocaine between Columbus and Portsmouth on a regular basis . . . ." Again, it is true, there was no citation to *Hensley* – but again the failure to cite *Hensley* did not affect the outcome. The court of appeals simply finessed the  unverified hearsay issue, holding that Joshua's detention could be justified by articulable facts that were unrelated to the read-and-sign bulletin and that were sufficient, standing alone, to give trooper Hannon a basis for suspecting criminal activity. That holding, like the trial court's holding, could hardly have been affected by a citation to *Hensley*. Against this background, I do not believe it was unreasonable for the state court of appeals subsequently to conclude that Joshua had failed to prove he was prejudiced by his lawyers' performance.

Although the absence of prejudice is in itself sufficient to require rejection of Joshua's claim, it seems to me that the claim founders on the "incompetence" branch of *Strickland* as well.  Joshua has made a colorable argument that his attorneys' failure to cite *Hensley* was "unreasonable under prevailing professional norms and . . . was not sound strategy." *Kimmelman*, 477 U.S. at 381 (citing *Strickland*, 466 U.S. at 688-89). But that argument is not so compelling, in my view, that its rejection by the state court of appeals must be considered unreasonable.  Given the "strong presumption" of constitutionally effective representation, *id.*, Mr. Joshua's *Hensley* issue would have to be more clearly meritorious than it is, in my view, for the state court to have been *required* to find his attorneys' performance deficient. It does not seem to me that the *Hensley* issue has such obvious merit.

I do not read *Hensley* as requiring the state to present proof, in every instance, of the facts known to a police officer who issues a wanted flyer or other intelligence report that is relied

upon by another officer.  The essential holding of *Hensley*, as I understand it, is that the officer who acts on the flyer need not be privy to the facts underlying its issuance – what matters, for purposes of determining whether a search or seizure is constitutional, is whether the issuing officer had a reasonable suspicion of criminal activity.  See *Hensley*, 469 U.S. at 232-33.  It does not necessarily follow from this that the state must always put on evidence of the facts known to the issuing officer, regardless of whether the arresting officer has information outside the intelligence report that lends credence to it.

The totality of the evidence presented at Joshua's suppression hearing strongly suggests that his detention for the relatively short time it took the officers to complete their investigation could be justified without the presentation of any additional evidence.  The hearing transcript contains evidence of the following facts, among others:

– At 11:07 on the morning of the drug bust, Trooper Hannon pulled Joshua over for speeding. The legitimacy of the speeding stop is uncontested.

– The vehicle driven by Joshua was a red Pontiac Sunfire with out-of-state plates.[2]  The car had been rented from the Enterprise car rental concern. Joshua produced some rental papers for Trooper Hannon's inspection, but the papers pertained to a maroon Geo Tracker and not to the red Pontiac. Trooper Hannon, not unreasonably, asked the dispatcher to check this discrepancy with Enterprise. At 11:22 a.m., having called Enterprise, the dispatcher advised the trooper that Mr. Joshua was entitled to be driving the Pontiac.

---

[2]The make and model of the vehicle were established at a preliminary hearing the transcript of which was incorporated in the record of the hearing on Joshua's motion for suppression of evidence.

– In the meantime, shortly after 11:10 a.m., the dispatcher had been alerted to the existence of the "Read & Sign" bulletin. The bulletin indicated that Trooper Mikesh was in receipt of information – information originating with the police department of Columbus, Ohio – to the effect that "an Aaron Joshua . . . was transporting crack cocaine between Columbus and Portsmouth twice a week . . . and that he was on parole [for] previous drug activity . . . ." This information was promptly radioed to Trooper Hannon. Significantly, Joshua himself had already told the trooper that Portsmouth was his destination and that he was driving there from Columbus.

– Trooper Hannon – again not unreasonably – asked the dispatcher to call for a drug-sniffing dog and to check with the police in Columbus and Portsmouth to see if there were any outstanding warrants for Joshua. There proved to be none, but the Portsmouth police officer with whom the dispatcher spoke turned out to be familiar with Joshua. The officer promised to "have a detective call [the dispatcher] back with further information." The dispatcher advised Trooper Hannon of this development at approximately 11:15 a.m., during the same radio transmission in which he reported the results of his calls to Columbus and to Trooper Mikesh, the officer in charge of the drug dog.

– Trooper Hannon's testimony, when read in conjunction with the dispatcher's, shows that the point at which the trooper learned about the Portsmouth police department's familiarity with Joshua and its promise to have a detective call back preceded the point at which the trooper learned that the car rental company had no problem with Joshua's driving the Pontiac. This timing, as we shall see, may have some relevance to our inquiry.

– Joshua was not free to leave the scene of the stop, of course, while the telephone calls and radio transmissions I have described were taking place. During the 10

minutes or so when Trooper Hannon was the only officer present, however, Joshua and his passenger were acting "[q]uite normal," according to the trooper, "like I would expect any person that I had stopped for [a] speeding violation to act."

– At 11:17 a.m. a second state highway patrolman, Trooper Barnes, arrived on the scene. With the arrival of the backup unit, according to Trooper Hannon, the behavior of the occupants of the Pontiac changed dramatically:

"They became extremely nervous, both Mr. Joshua and Miss Chapman began looking over their shoulder. Mr. Joshua was looking out the driver's side window trying to see behind him, *there was constant activity in the vehicle.* I've never stopped a vehicle where I've seen so much activity and so much concern from the occupants about what was going on around them and behind them." (Emphasis supplied.)

– Trooper Barnes confirmed this account, testifying that "I noticed that there was a lot of movement in the vehicle . . . . [Joshua] kept looking back. He was continually keeping his eyes on myself and Trooper Hannon by either physically turning around or looking through the rearview mirror." When asked if Joshua's movements were "the usual type of movements" made by the subject of a traffic stop, Trooper Barnes answered "No." As the trooper went on to explain,

"Most people will turn and look, but not continually on a non-stop basis, you know. Eventually, they'll kind of relax and settle down, but that wasn't the case in this instance."

– At a time not entered in the log, according to the dispatcher's testimony, but probably at his first opportunity after completing his phone calls (*i.e.*,

sometime after 11:22 a.m.), the dispatcher ran a criminal history check on Joshua. The dispatcher testified unequivocally that he transmitted the results of the criminal history check to Trooper Hannon.

– At 11:48 a.m., while Trooper Mikesh was on her way to the scene with her drug dog, the dispatcher received the promised call from Portsmouth. The caller, a Detective Sgt. Brewer, confirmed that the Portsmouth police department was familiar with Aaron Joshua. Detective Brewer went on to tell the dispatcher that "Joshua might be considered dangerous and possibly carried a weapon." The dispatcher so advised all units.

– Trooper Mikesh, who had just heard the dispatcher's latest report over her radio, reached the scene at 11:49 a.m. She saw Mr. Joshua seated in the Pontiac with both his hands outside the door and his head craned uncomfortably over his left shoulder. Trooper Hannon told her that there had been a lot of movement in the car – and Trooper Mikesh observed more movement as she approached the vehicle: "I observed Mr. Joshua make a sudden movement," she testified, "and reached down underneath with his right hand underneath the driver's seat." Trooper Mikesh immediately ordered Joshua and his companion to get their hands up. When satisfied that it was safe to do so, she ordered them to put their hands on the dash. Thereafter, the windows of the Pontiac having been raised, Trooper Mikesh had her dog sniff the vehicle. There has been no contention that the dog (or any other dog) could have been brought to the car earlier than this dog was.

– At 11:53 a.m. the dog alerted on the right seam of the right front door, aggressively scratching at the vehicle. The occupants of the Pontiac were then patted down, Trooper Mikesh handling the (visibly pregnant) passenger, Ms. Chapman. Some ten bundles of crack cocaine were found in a plastic bag secured just below

Ms. Chapman's enlarged abdomen. Her arrest, and that of Joshua, followed.

Given this considerable body of evidence, which bespeaks excellent police work throughout, I believe that a competent attorney could reasonably conclude that the government had carried its burden of proof at the suppression hearing. With respect to the 15-minute period from 11:07 a.m. to 11:22 a.m., it is obvious that Trooper Hannon did not need the "Read & Sign" bulletin to justify Joshua's detention from the point at which the discrepancy in the rental papers was first noticed to the point at which the discrepancy was resolved. Joshua was driving a car that did not belong to him, after all, and he claimed to have rented it. The car described in his rental papers was not the car he was driving. Any conscientious police officer would have wanted to assure himself that the car had not been stolen, and it was not unreasonable for Joshua to be kept at the scene while his story was being checked with the car rental company.

We do not know the precise time at which Trooper Hannon first noticed the discrepancy in the rental papers, but it is probably fair to infer that it was a little after 11:15 a.m. This was only eight minutes after the speeding stop. Joshua had not theretofore been free to leave, of course, but there was a good reason for his detention, the interval was very short, and it was still close to the time of the speeding infraction.

When Trooper Hannon learned, at 11:22 a.m., that the car had not been stolen, Joshua should and doubtless would have been allowed to depart had the trooper not known of other suspicious facts. But by 11:22 a.m. the trooper had knowledge of several such facts, and he had knowledge of more soon thereafter.

Fact number one was that Joshua said that he was driving – by a somewhat improbable route – from Columbus to Portsmouth.

Fact number two was that the highway patrol was in receipt of information, said to have originated with the Columbus police department, that a man with Joshua's name – a man on parole in connection with a drug offense – was transporting crack cocaine from one Ohio city to another twice a week. The identity of the cities is of critical importance. The drugs were not reported to be moving from Cleveland to Chillicothe, or from Toledo to Youngstown, or from Canton to Gallipolis; they were reported to be moving from Columbus to Portsmouth, the very cities named by Mr. Joshua himself. The detailed nature of the intelligence from the Columbus police department, coupled with the information provided independently by Joshua, thus gave rise to articulable grounds for believing that the intelligence furnished by the Columbus police was accurate. What policeman would not have called for a drug dog under these circumstances?

Fact number three was that before the all-clear arrived from the rental car company, Trooper Hannon had learned of a highly interesting telephone conversation between his dispatcher and a police officer in Portsmouth. The State of Ohio has a population of 11 million people, most of whom are strangers to the Portsmouth police – but Trooper Hannon was aware, at approximately 11:17 a.m., that Aaron Joshua was known to the police of Portsmouth. Joshua might not have been known in Chillicothe, or Youngstown, or Gallipolis, but he was known by the police in the very city to which it had been reported he was transporting drugs. It was not objectively unreasonable, therefore, to detain Joshua a little longer so that the dispatcher could get a reading on him from the Portsmouth detective who was supposed to call the dispatcher back.

Fact number four is that although Joshua and his companion had not behaved suspiciously while there was only one officer on the scene, they began acting strangely when the backup arrived. The change in behavior would be consistent with the hypothesis that Joshua was not worried

about being stopped for speeding, and was not worried about having his rental papers checked, but was very worried by the trooper's being reinforced – an indication to Joshua that the highway patrol might be investigating something beyond a speeding offense and an irregularity in rental papers. The constant movement within the Pontiac would be consistent both with heightened nervousness and with activity to get drugs positioned where they would be hard to detect if the car were searched.

Fact number five – at least if the dispatcher's memory was not playing tricks on him – is that Trooper Hannon was made aware of Joshua's criminal history sometime after 11:22 a.m. The record does not show what that history was, but one can reasonably infer that the dispatcher thought it significant enough to merit telling Trooper Hannon about it.

Fact number six is that by 11:48 a.m. the troopers were advised of the warning of the Portsmouth detective that Joshua might be armed and dangerous. And fact number seven is that as soon as it was possible to have a drug dog sniff the Pontiac, the dog signaled that there were drugs in the car.

All of these facts, as I say, were brought out at the suppression hearing. In their totality, I believe, they were sufficient to suggest that there was no deficiency in the state's proof – *i.e.*, that *Hensley* did not require further verification of the "Read & Sign" bulletin. *Cf. Illinois v. Gates*, 462 U.S. 213, 244-45 (1983). That being so, I am not persuaded that the failure to cite *Hensley* in support of the suppression motion necessarily bespoke incompetence.

If I am wrong in this, however – and if I am wrong in my *Strickland* analysis – Joshua would still not be entitled to habeas relief if the federal exclusionary rule (made applicable to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961)) would not render the evidence of Joshua's guilt inadmissible. I do not believe it would.

The exclusionary rule was developed by the judiciary to serve prophylactic purposes – to deter wrongdoing by those responsible for enforcing the law. See *Arizona v. Evans*, 514 U.S. 1 (1995). Here there was no wrongdoing at all by the police officers who seized the evidence; their work was highly professional from start to finish. There is no reason to suppose that the Columbus police officers who initially provided the information in the "Read & Sign" bulletin were guilty of any wrongdoing either – and there is every reason to suppose they were not. Neither do I see any wrongdoing on the part of the prosecutor, who, in a borderline case, elected not to incur the expense of bringing a police officer from Columbus to Chillicothe for the purpose of justifying a police bulletin that appears to have been accurate. If the federal courts are going to second-guess this kind of judgment call on the part of state prosecutors, requiring the exclusion of vital evidence as a result, I believe the courts will have gone far beyond the original purpose of the exclusionary rule. That rule rests solely on policy considerations, after all, and I can see no sound policy reason for excluding the evidence of Joshua's crime under the circumstances presented here.

Finally, at the risk of belaboring the obvious, I would reiterate that we are not reviewing the decisions of the state courts on direct appeal. The fact that we may think the state courts reached the wrong result is not controlling. Absent "an unreasonable application of clearly established federal law," as Congress has told us in the provision codified at 28 U.S.C. § 2254(d), or a decision "contrary" to such law, the granting of federal habeas relief is forbidden. I do not believe that the decisions rendered by the state courts in the matter now before us fail the statutory test, and I therefore believe that the district court acted correctly in denying Joshua's application for the writ. My colleagues on the panel having seen the matter differently, I respectfully dissent.